**KITANIHON–OI STEAMSHIP COMPANY,**
Plaintiff-Appellant,

v.

**GENERAL CONSTRUCTION COMPANY, et al., Defendants,**

**and**

**Sacramento-Yolo Port District,
Defendant-Appellee.**

No. 81–4146.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1982.

Decided May 26, 1982.

Eric Danoff, Graham & James, San Francisco, Cal., for plaintiff-appellant.

Donald F. Farbstein, Farbstein, Brown & Pillsbury, San Mateo, Cal., argued for defendant-appellee; Philip L. Pillsbury, Jr., Farbstein, Brown & Pillsbury, San Mateo, Cal., on brief.

Before GOODWIN, SNEED, and ANDERSON, Circuit Judges.

SNEED, Circuit Judge:

The issue in this case is whether the compulsory pilotage clause in the tariff of the Sacramento-Yolo Port District (the Port) creates an implied warranty that its commissioned pilots will perform nonnegligently. The particular arrangement by which pilots are provided for the Sacramento Deepwater Ship Channel (the Channel) makes this case one of first impression. We hold that because the pilots are not employed or paid by the Port, the Port's role in commissioning the pilots and requiring their use creates no implied warranty of nonnegligent performance.

### FACTS

This action stems from the grounding of the vessel M/V Oji Maru No. 1 (Oji Maru), a bulk cargo carrier under the Japanese flag, in the Sacramento River on the night of February 12, 1977. The plaintiff-appellant is Kitanihon-Oi Steamship Company (Shipowner), a Japanese corporation and the owner of the Oji Maru. After loading a cargo of wood chips for Japan at Sacramento, the Oji Maru proceeded downriver under the pilotage of Captain Franklin Pierce, a pilot commissioned by the Port. At Three Mile Slough, the ship encountered the dredge Missouri, which was improperly lit and improperly attended. These circumstances, plus the negligent navigation of the pilot, caused the Oji Maru to go aground, causing substantial damages to Shipowner, who subsequently brought suit in district court to recover the damages. The district court had jurisdiction in admiralty under 28 U.S.C. § 1333 and by virtue of diversity of citizenship under 28 U.S.C. § 1332(a)(2).

The district court determined on a motion for summary judgment that the Port had no liability to Shipowner for breach of contract or implied warranty. On subsequent trial to determine liability, the district court found the dredge owner 70% at fault and the Oji Maru 30% at fault. Shipowner appeals the district court's finding that Shipowner has no cause of action against the Port based on the Port's implied warranty that the pilot would perform his services nonnegligently.

### DISCUSSION

Our discussion must commence with *City of Long Beach v. American President Lines*, 223 F.2d 853 (9th Cir. 1955). There we held

that a city which requires the use of pilots furnished by it through an independent contractor on ships in its harbor is liable for the negligent performance of those pilots under an implied covenant to perform personal service with the necessary skill and without neglect.

In *City of Long Beach* there was no written contract between the shipowner and the city other than the tariff. The shipowner paid the city pilotage fees of which the city retained 40% and paid over the remaining 60% to the independent contractor, Jacobsen. We found that the city acted in a proprietary capacity in maintaining and operating its harbor "because it thinks it is good business for it, representing its citizens, to do so." *Id.* at 856. The pilot boarded and navigated the vessel pursuant to the city's tariff requirement of compulsory pilotage, as a member of the city's "staff of pilots."[1] *Id.* at 857. Under these circumstances the shipowner had a contract of pilotage with the city, which was liable in tort and contract to the shipowner for negligence of the pilot.

The present case differs from *City of Long Beach* in one significant way. Here, Shipowner paid the pilot directly, and the Port itself paid no fees to the pilot. The Port commissions a limited number of pilots in order to protect the earning capacity of those commissioned, who in February 1977 numbered eight. The standard pilot's fee schedule is arrived at by negotiations between the Bay Area pilots and the maritime steamship associations conducted at meetings which the Port attends. Shipowners must use a commissioned ship's pilot to comply with the compulsory pilotage clause of the Port's tariff.[2] The Port's primary relationship with the pilot is as the source of his commission, which the pilot holds at the pleasure of the Port through its Pilot Advisory Board. While the Port's power to decommission a pilot temporarily or permanently at its sole discretion gives teeth to its rules and regulations governing commissioned pilots and use of the Channel,[3] the Port does not hire the pilot either directly or indirectly. *Cf. Washington v. M/V Dilkara*, 470 F.Supp. 437 (W.D.Wash.1979) (state that regulates, controls, and requires the use of licensed pilot not liable for pilot's negligence).

Shipowner argues that the economic substance of the arrangements in *City of Long Beach* and here is the same. In both cases, Shipowner insists, pilots provide pilotage services to the shipowners and fees paid by the shipowners compensate the pilot. That the City in *City of Long Beach* acted as a middle-man collecting tariffs from shipowners and paying a portion of those tariffs to an independent subcontractor who employs the pilots should make no difference. In either case, the shipowners' money ends up in the pilots' pockets.

That the presence of an employment contract between the shipowner and the pilot distinguishes the cases provides small comfort to Shipowner. In *City of Long Beach* we considered the presence of such an employment contract decisive. In finding lia-

1. The pilots were not city employees; they worked for an independent contractor under contract to the City.

2. The Port's tariff applies to all sea-going ships using the Port of Sacramento. In February 1977 its pilotage clause read as follows:

   (a) Except as provided in paragraph (b) below, the privilege of using any wharf or terminal facility of the Port of Sacramento will be denied to any seagoing vessels entering or leaving the Port of Sacramento without the services of a pilot commissioned by the Port of Sacramento. It is understood that such pilot shall act only in the capacity of advisor to the master of the vessel.
   (b) Vessels enrolled by the United States of America and exempt from federal laws are not subject to requirements provided in paragraph (a) above.
   Excerpt of Record 40. "Enrollment" is limited to United States flag vessels that do not call at foreign ports. 46 U.S.C. §§ 252, 278 (1976).

3. Among other requirements, pilots must obtain clearance to leave the Port from the Port's Operations Manager; make vessel position reports at five specified locations; and notify the Port of any collisions and groundings en route. Excerpt of Record 30. The Port also has the power to close the Channel by ordering the commissioned pilots not to take any ships up or down it, as the Port Director did after the grounding of the Oji Maru. Excerpt of Record 196–98.

bility we characterized the City's conduct thus: "Long Beach said, 'Stay out unless you let us furnish you our pilot at a price we fix, which you shall pay us, and which you shall not pay the pilot.'" *Id.* at 858. While here the Port arguably "furnished" a pilot (although Shipowner had a choice from eight pilots then commissioned), the Port did not fix the price, Shipowner did not pay the pilotage fee to the Port, and Shipowner *did* pay the fee to the pilot. Thus, most of the factors considered crucial to implied warranty liability in *City of Long Beach* are lacking here.

There is appeal to Shipowner's contention that the required use of only pilots commissioned by the Port in fairness should entitle it to look to the Port for compensation for negligent performance by those pilots. At first glance, it seems unjust to permit the Port to shoulder Shipowner's preferred pilot from the helm while disclaiming all responsibility when its commissioned pilot runs the ship aground. More careful scrutiny, however, reveals this perception to be much less compelling.

The Port in requesting that the Shipowner's pilot be one commissioned by it serves an interest unrelated to the welfare of particular pilots. It no less than the shipowners has every incentive to avoid collisions and groundings in the Channel, the "lifeline" for the Port's existence. Excerpt of Record 187. The Port included compulsory pilotage in the tariff to prevent blockage of the Channel, which would reduce the Port's business. *Id.* The monopoly the Port grants its commissioned pilots to protect their livelihood also increases the pilots' specialized local knowledge by virtue of more frequent piloting of the Channel. Thus, the

Port's interest in safety—which is identical to the shipowners'—may well be best served by compulsory pilotage.

Given the lack of any contract between the Port and Shipowner for pilotage services such as existed in *City of Long Beach*, and the sound justification for the Port's pilotage arrangements, we affirm the district court's holding that Shipowner has no cause of action against the Port for the negligence of its commissioned pilot.

This result gains strength when access to insurance is considered. Assuming that accidents will occur even when competent pilots are employed, the cost of those accidents should no doubt fall on those best able to insure against them.[4] A shipowner knows or can easily ascertain the value of his ship and its cargo, and the cost to him of damage or delay. He is in a better position to match his insurance coverage precisely to the risk than is the Port. Moreover, the protection and indemnity insurance carried by all sea-going vessels already covers accidents under pilotage like that of the Oji Maru. A. Parks, *Law of Tug, Tow & Pilotage* 1035 (2d ed. 1982). Imposing liability on the Port here would require it to carry insurance whose cost it would have to recoup in higher tariffs. No deterrent effect can be expected from imposing such liability inasmuch as the Port already has ample incentive to avoid accidents. The net effect of imposing liability on the Port would be an increase in fees to shipowners without any corresponding increase in insurance coverage.[5] This would achieve very little. The loss should remain where it fell, on the Shipowner. He must look to his insurance carrier.

AFFIRMED.

**4.** Because shipowners must hire a commissioned pilot, they are not in a position to demand that pilots insure. And pilots have no incentive to insure—although the clause in their form contract exculpating them from liability for all acts as pilot is void as against public policy, ER 261; *United States v. SS President Van Buren*, 490 F.2d 504, 509 (9th Cir. 1974) (by implication), they are usually judgment-proof in any event.

**5.** We note that the extra cost of redundant insurance coverage resulting from the imposi-

tion of liability for pilots' negligent performance has received the attention of the Oregon State Legislature, which has authorized pilots to limit the imposition of such liability by contract. Under the statute, pilots so contracting must offer "trip" insurance coverage to vessels that specially request it. The pilots are authorized to raise the tariff to such vessels in an amount equal to the "trip" insurance premium. Or.Rev.Stat. § 776.520 (1979). *See* A. Parks, *Law of Tug, Tow & Pilotage* 1034–36 (2d ed. 1982) (approving statute).

**J. BLAINE ANDERSON, Circuit Judge, dissenting:**

I am not persuaded that this is a case of first impression. This case cannot be distinguished in a principled way from *City of Long Beach v. American President Lines*, 223 F.2d 853 (9th Cir. 1955), and we should apply its holding here.

The mere fact that this small cadre of compulsory pilots is not directly employed or paid by the Port is not dispositive. As urged by Shipowner, the economic reality and substance is the same here as in *City of Long Beach*. The realistic situation is that the Port has plenary power to reject any pilot not commissioned by it. Through its tariff and the negotiations with Bay Area pilots and maritime associations, the crucial fact, like *City of Long Beach*, is that the Port has arrogated unto itself total control of pilotage for its own benefit and for the benefit of a few select pilots.

Finally, the existence of insurance or not has nothing to do with the determination of the liability issue in this case.

There is an implied covenant to perform the personal pilot service with the necessary skill and without neglect. I respectfully dissent and would reverse the district court's contrary ruling.