CHEVRON U.S.A., INC., Plaintiff,

v.

The VESSEL J. LOUIS, et
al., Defendants.

In the Matter of the Complaint of CAR-
IBBEAN STEAMSHIP COMPANY,
S.A., as Owner of the Vessel J. Louis,
for Exoneration From or Limitation of
Liability.

Nos. 85–1764–CIV–T–17,
85–1771–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 22, 1988.

Chester L. Skipper, Lyle & Skipper, P.A.,
St. Petersburg, Fla., for Chevron U.S.A.,
Inc.

Edward F. Gerace, Tampa, Fla., for St.
Philip Towing and Transp. Co.

Nathaniel G.W. Pieper, Lau, Lane, Pieper
& Asti, P.A., Allen Von Spiegelfeld, Fowl-
er, White, Gillen, Boggs, Villareal & Bank-
er, P.A., Tampa, Fla., for Harry Williams.

Dewey R. Villareal, Jr., Fowler, White,
Gillen, Boggs, Villareal & Banker, P.A.,
Tampa, Fla., for Caribbean S.S. Co., S.A.,
as owner of the VESSEL J. LOUIS.

James M. Tompkins, Galloway, Johnson,
Tompkins & Burr, New Orleans, La., Ed-
ward F. Gerace, Tampa, Fla., for A.P. St.
Philip, Inc., Manatee Tug & Barge Lines,
Inc.

## MEMORANDUM OPINION

KOVACHEVICH, District Judge.

This cause came on before the Court,
sitting without a jury, for trial on Novem-
ber 16, and 17, 1988. After consideration
of the testimony, exhibits, and arguments
of counsel, the Court makes the following
findings of fact and conclusions of law. To
the extent that any of the findings of fact
might constitute conclusions of law, they
are adopted as such. Conversely, to the
extent any conclusion of law constitutes a
finding of fact, they are adopted as such.

## FINDINGS OF FACT

1. On November 6, 1985, the vessel J.
LOUIS (the vessel) was owned by Caribbe-
an Steamship Company (Caribbean), plain-
tiff in limitation, and was operated by
Skaarup Management Company (Skaarup),
defendant.

2. The vessel was built in 1961, and is a
single screw, steam turbine vessel with an
overall length of six hundred ninety-nine
feet and six inches (699′ 6″) and a beam of
ninety (90) feet. The ship has a right-hand-
ed propeller and backs to port. In reverse,
the ship's stern moves to port and bow
moves to starboard.

3. On the night of November 6, 1985, the vessel and her crew prepared for entry into Tampa Bay and performed all of the required Coast Guard tests prior to taking on a pilot. The intent was to dock the vessel at the National Gypsum dock (dock) in Port Tampa, Florida. The master aboard the vessel was Captain Yung Peng Tiao.

4. As it entered the harbor on that night, the draft of the vessel was reported as thirty-three feet six inches (33′ 6″) forward and thirty-three feet (33′) aft, with a gross tonnage of twenty thousand two-hundred and fifty-two (20,252) tons.

5. On November 6, 1985, the pilot was Harry J. Williams (Williams), a State licensed pilot. Williams boarded the vessel near the sea buoy at approximately 2050 hours (8:50 p.m.) in order to navigate the vessel, at high water slack, to the dock.

6. The "Tampa Bay Pilots' Recommendations for Vessel Movement" (Pilot's Recommendations) states that vessels with drafts between 23′ and 33′6″ should move in the area of Port Tampa only during high water slack. (Def. Exs. 51A and 51B). The National Oceanographic and Atmospheric Administration tidal table for November 7, 1985, shows high water slack was to occur at about fifty-two (52) minutes after midnight and maximum ebb current would occur at 3:05 a.m. on a course of 215 degrees. (Def. Ex. 52).

7. Captain Williams testified that he helped draft the Pilot's Recommendations. He stated that the purpose of the above-recited regulation was to prevent accidents and said it would be dangerous to take a 33′ draft vessel into Port Tampa at close to maximum ebb current.

8. After boarding Williams sought no information from the captain concerning the vessel's characteristic, i.e., speed at different settings, whether the anchors were ready to be deployed. The reason he did not ask whether the anchors were ready was because he believed that it was "normal seamanship procedure" to have the anchors ready to drop before entering Tampa Bay because you never know when it might be necessary to drop one. (The ex-

pert witnesses agreed that it was "normal seamanship procedure."). Only the port anchor of the vessel was ready to be dropped.

9. The pilot ordered the ship to go full ahead at maneuvering speed from 2055 to 2115 (8:55 to 9:15 p.m.), when he ordered full "sea speed" of 80 r.p.m.'s. The order for full "sea speed" was maintained for the next two (2) hours and twenty (20) minutes.

10. Williams, stating the wheelhouse was dark, did not read the vessel's speed date posted in the pilothouse. The data revealed that full maneuvering speed at 70 r.p.m.'s would generate 11.84 knots and that 80 r.p.m.'s would generate 13.53 knots.

11. It had been arranged that the Tugs Yvonne and Palmetto, owned by A.P. St. Philip, Inc. (St. Philip), and operated by Manatee Tug & Barge Lines, Inc. (Manatee Tug), would assist the vessel from G-cut to the dock. The tugs were approximately one-hundred feet (100′) in length by twenty-six feet (26′) abeam and generated about 3,000 horsepower.

12. The pilot slowed the ship to half ahead at 2335 (11:35 p.m.) and to slow ahead at 2343 (11:43 p.m.), reducing the ship's speed to 10.15 knots and to 6.76 knots respectively, in preparation to meet the tugs.

13. The turn from G-cut channel and J-cut channel is a turn or about 80 degrees, which is normally negotiated by a "dog lead" or widener set at 40 degrees. The tugs Palmetto and Yvonne joined the vessel at this point. At about 2355 (11:55 p.m.) the vessel, with the two tugs assisting, grounded at the west end of G-cut.

14. The skipper of the Palmetto, Captain Strickland, estimated the speed of the vessel at the time of the grounding to have been about 6 knots. (There was general concurrence among the experts and captains who testified that in order for a tug to get on a 90 degree angle to a ship, it would be necessary for the ship not to be exceeding a speed of about 3 knots.).

15. At no time during the voyage to the dock did Williams check the ship's tachome-

ter to insure that his orders were being carried out properly by the Chinese crew.

16. The tugs arrived alongside the vessel at about 2345 (11:45 p.m.). The ship was then approximately a mile and a half from the G-cut turn into the J-cut.

17. There is no competent evidence that there was an engine failure on the Yvonne which contributed to the grounding.

18. After the grounding occurred, Williams called the dispatcher to engage the assistance of the Tug Tampa (the Tampa) in order to get off the strand before the tide started ebbing. The Tampa is a twin-diesel, twin-propeller, 10 rudder, flanking rudder tug and is considered to be the most powerful and maneuverable tug on Tampa Bay. The Tampa arrived on the scene at about 0224 (2:24 a.m.) and freed the vessel almost immediately, so that about 0234 (2:34 a.m.) the vessel's engines were ordered ahead.

19. At this time, the Tampa replaced the Yvonne as the ship's port bow helper tug. The crew on the Tampa consisted of Captain Milladge Harvey, Captain Buddy Wendel and three deckhands. Captain Wendel had had four (4) days training in operating the Tampa and was on the night in question training Captain Harvey.

20. Captain Williams had not utilized the Tampa before the night of November 6, 1985. Williams first requested the Tampa to get on the starboard bow of the vessel. Captain Wendel suggested that due to the power and maneuverability of the tug it would be as effective if positioned on the port bow; this would obviate the need for the tug to switch sides of the ship on arrival at the port.

21. Captain Williams, thereafter, had the Tampa remain on the port bow, about sixty (60) feet aft of the stem with one line up to a chock approximately in the middle of the fo'c's'le. The ultimate responsibility for positioning the tugs fell to Captain Williams.

22. Due to the grounding delay, the vessel was approximately one (1) hour and forty (40) minutes late for high water slack. The vessel departed the G-cut/J-cut

intersection with a slow ahead order. The engines were stopped approximately one (1) minute later for about one-half (½) minute, resuming at slow ahead.

23. From 0236 (2:36 a.m.) to about 0316 (3:16 a.m.), the speed of the vessel varied from slow ahead to full ahead. The average speed from the time the vessel was freed until the engine was ordered full astern off Port Tampa was 5.02 knots. During the time from about 0234 (2:34 a.m.) to 0324 (3:24 a.m.) the vessel was towing the tugs Tampa and Palmetto.

24. The collision with the dock occurred at approximately 0330 (3:30 a.m.). At the time of the approach the tugs were no longer acting as drag on the ship; they were complying with the pilot's orders to push the ship in a clockwise direction. The tug Palmetto was to push the stern starboard and the Tampa was to push on the port bow.

25. The tug captains testified that the ship was moving too fast for either tug to get on the ordered ninety (90) degree angle. Eventually the ship's headway was slowed by the combination of her full-astern engine setting and the sliding pivoting turn into the slip and the tugs were able to get on angles of ninety (90) degrees to the ship.

26. Pilot Williams admitted that he was aware of the difficulty in the tugs getting a ninety (90) degree angle and, if he had been afraid that the tug was going to push the ship too far to the north, he could have ordered the tugs to stop or to reverse their engines.

27. The Tampa might have been able to achieve a ninety (90) degree angle, at least temporarily, if she had "twin screwed" her engines (port engine ahead and starboard engine astern). However, the preponderance of the evidence is that such a maneuver would have totally neutralized her assistance to the ship in turning and might have resulted in the ship's decreased turning momentum and carried her into collision with the caisson near the northwest corner of the entrance.

28. It was the perception of Williams that the bow of the ship "narrowly missed"

hitting the caissons (referred to as "can openers") on the western end of the northern bulk head line as she entered the slip pointed in a southeasterly direction at an angle of about thirty (30) degrees off of the axis of the slip.

29. In order to compensate for the possible impact that the nearly maximum ebbing current would have on the port side of the starboard turning ship, the pilot's approach into the port had deliberately been much closer to the rocky north bank of the 250 foot wide slip canal and to the two "can openers" than normal.

30. The approach of the vessel to the slip was too fast and too far to the north; therefore, the Tampa was only able to push on the port bow of the vessel as best it could until it became evident that the tug was in danger of being dragged into collision with the outer caisson. The tug came within just a few feet (estimates ranged from two (2) feet to ten (10) feet) of the caisson. The captain of the tug had to order his crew to slacken the tug's line to the vessel so the tug could slide back along the ship's port side and clear the caisson.

31. The preponderance of the evidence reveals that the captain of the Tampa radioed the pilot of the vessel that he was going to have to slacken his line. The crew had to slack out approximately two-hundred (200) feet of line, leaving the tug close to the midship pilothouse of the vessels.

32. The Tampa crew began to retrieve the ten (10) inch line using the bow capstan at high speed (fifteen (15) r.p.m.'s) as soon as she cleared the outer caisson. The crew had retrieved about fifty (50) to one-hundred (100) feet of line when the Tampa received an order from the pilot to back full. The tug's captain did his best to comply with the "full astern" order.

33. At this time, the vessel was pointed toward the southeast at an angle of thirty (30) degrees below the axis of the slip. The pilot estimated the bow of the tug to be sixty (60) feet away and on an angle of forty-five (45) degrees to the ship. In that position, the hundred (100) foot long tug would have been only approximately fifteen (15) degrees short of perpendicular to the north bank of the slip. With the vessels in that position, more than the 250 foot wide slip would have been occupied which is, of course, impossible.

34. No witness saw or felt the impact with the dock; therefore, it is impossible to determine exactly when the allision occurred, in relation to any order or activity taking place in the slip.

35. The tug Tampa's crew did its best to comply with the pilot's order by placing four turns of the towline around the capstan drum and securing it with two figure eights on the forward H bitt and retreated in case the line would break under the strain. The line did not break but did slip briefly before the crew, putting themselves at risk, put another figure eight on the bitt.

36. The ship's momentum of swing carried the bow stem into allision with the Chevron dock at approximately 0331 (3:31 a.m.) on November 7, 1985.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this maritime claim and venue is properly in the Middle District of Florida, Tampa Division. 28 U.S.C. § 1333.

2. The speed of the vessel J. LOUIS as it approached the entrance to the slip in Port Tampa was an excessive rate of speed for the maneuver that was required to bring the vessel into the slip and dock it properly.

3. Pilot Williams clearly breached the Tampa Bay Pilot's "Recommendations for Vessel Movements", which recommend vessels with deep drafts to move into the port during high water slack. Instead the vessel's arrival at the slip coincided with near maximum ebb.

4. The vessel was turned too late (too far north) and the position of the vessel, at a point too far to the north, contributed to the allision.

5. The tug Tampa, due to errors in judgment made by pilot Williams, and concurred in by the action or inaction of the master of the vessel, was forced to loosen its line to the vessel, in order to avoid being

crushed on the western most dolphin on the north side of the slip. The actions of the captain of the tug Tampa were prudent and necessary and these actions were properly reported to the pilot. (Even assuming the action was not reported to the pilot, the Court would find that the failure to do so was not a contributing factor in the allision.)

6. The allision occurred at approximately 0331 (3:31 a.m.). The Court finds the casualty was attributable to the negligence of the pilot and vessel master in navigating the vessel at an excessive rate of speed so that she ran aground, missed high water slack, and then tried to compensate for the delay by proceeding too fast and too far north as she entered the port. The situation was exacerbated by the failure of the ship's officers to take any steps to correct the excessive speed ordered by the pilot, failure and inability to drop the starboard anchor, and failure to communicate between themselves as the situation developed.

7. The tug Tampa was placed in a position of peril and the captain and crew did all they could to assist the ship in the perilous circumstances caused by the vessel's pilot and master. Due to the emergency situation, created by others, the crew acted as expeditiously as possible in attempting to secure the line to the bitt and in preserving their own safety. There is no proof that the Tampa could have stopped the momentum of the ship in time to avoid or mitigate any damages, even if there had been no slippage of the line.

8. The tugs Tampa and Palmetto were both seaworthy and their operators at all times followed the orders of the pilot to the best of their ability. At the conclusion of the evidence, the tug Palmetto and its owners were voluntarily dismissed from the cause of action, as being without fault in causing or contributing to the casualty. The Court finds the Tampa to be without fault in causing or contributing to the allision. The tug was placed, by the pilot and master of the vessel, in a position of sudden peril and emergency, which situation did not arise as a result of the tug's own previous fault. Therefore, even if the Court were to decide that the Tampa was somehow negligent in failing to keep the towline from slipping as it backed full astern, as the pilot ordered, such alleged negligence must be excused under the *in extremis* doctrine. *National Bulk Carriers v. United States*, 183 F.2d 405 (2nd Cir.1950), *cert. denied*, 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631. Accordingly, it is

ORDERED that the Clerk of the Court shall enter judgment in favor of Defendants A.P. St. Philip, Inc. and Manatee Tug & Barge Lines, Inc. dismiss the cause of action against said Defendants. Plaintiffs the Vessel J. Louis, Caribbean Steamship Co., Skaarup Shipping Co., Reynolds Metals Co. and Harry J. Williams are 100 percent responsible for the damage caused by the allision with the Chevron dock.