**PUERTO RICO PORTS AUTHORITY,**
Plaintiff, Appellee,

v.

**M/V MANHATTAN PRINCE, et al.,**
Defendants, Appellees.

**SUJEEN TRADING PTE., LTD.,**
Claimant, Appellant,

v.

**CROWLEY TOWING & TRANSPORTA-
TION CO., Defendant, Appellee.**

No. 88–1533.

United States Court of Appeals,
First Circuit.

Feb. 22, 1990.

Paul E. Calvesbert, with whom Jaime Morgan–Stubbe and Calvesbert & Brown, were on brief, for claimant, appellant.

William A. Graffam, with whom Jiminez, Graffam & Lausell, were on brief for, defendant, appellee Crowley Towing.

Hector Cuebas Tanon, with whom Vincente & Cuebas, were on brief, for plaintiff, appellee Puerto Rico Ports Authority.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Shortly after 8 p.m. (2012 hours) on August 15, 1985, the tanker Manhattan Prince, while in the process of docking, collided with a pier. The allision occurred in the Army Terminal Turning Basin, Puerto Nuevo Channel, San Juan Harbor, Puerto Rico. An *in rem* action against the vessel was brought by the Puerto Rico

Ports Authority (PRPA) and the Puerto Rico Electric Authority for damages caused to facilities on the pier owned by both authorities. Shortly thereafter, Sujeen Trading PTE., LTD., (Sujeen), the owner of the tanker, brought an action for damage to the tanker's bow incurred in the allision and damages due to loss of hire against Crowley Towing and Transportation Company (Crowley) and against Captain Oscar Camacho, the compulsory pilot. Crowley was the owner of two tugboats, the Borinquen and El Morro, which had been hired by the tanker to help her dock. The claim against Crowley by the tanker was based on the alleged negligence of the tug Borinquen; the tug El Morro is not involved in the case. In both cases, the defendants filed cross claims and counterclaims against each other.

The cases were consolidated for trial and a bench trial was held in August, 1987.[1] The district court found the vessel and the pilot "jointly, severally and equally liable" for damages to the pier facilities, which amounted to $53,000. It found Crowley and the Electric Authority not liable to Sujeen for damages to the tanker. It found the pilot, Comacho, liable to Sujeen for half of the vessel's damages. These amounted to $194,723.40 for repairs to the bow of the tanker and $142,951.49 for loss of hire. The court further found that the PRPA was not liable for the negligence of the pilot. The court addressed the vicarious liability of the PRPA in an opinion published at 669 F.Supp. 34 (D.P.R.1987).

Sujeen has appealed the holding that the ship was at fault for the allision and the ruling that the PRPA was not vicariously liable for the negligence of the pilot. The pilot has not appealed, and there has been no appeal on the computation of damages. There are, therefore, two basic issues to be reviewed: whether the tanker was 50% at fault for the allision, and whether the PRPA is responsible for the negligence of the pilot. We start with the negligence issue.

I.

A. *Standard of Review*

■ We review the district court's finding of fact under the clearly erroneous standard, the same as that set forth in Fed.R.Civ.P. 52(a). *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed....'" *Id.* (citations omitted). *See DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 749 (1st Cir.1989); *EAC Timberlane v. Pisces Ltd.*, 745 F.2d 715, 722 (1st Cir.1984); *Capt'n Mark v. Sea Fever Corp.*, 692 F.2d 163, 166 (1st Cir.1982).

In *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Court jettisoned the old rule of divided damages in admiralty collision cases that required an equal division of property damage whatever the relative degree of fault of the tortfeasors may have been. It held that:

> when two or more parties have contributed by their fault to cause property damage in maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault *or when it is not possible fairly to measure the comparative degree of their fault.*

*Id.* at 411, 95 S.Ct. at 1715–16 (emphasis added). In this case, the court explicitly found: "Because it is impossible to fairly allocate proportional degrees of fault, the damages shall be equally divided between the 'Manhattan Prince' and Oscar Camacho. *United States v. Reliable Transfer*, 421 U.S. 397 [95 S.Ct. 1708, 44 L.Ed.2d 251] (1975)."

■ The clearly erroneous standard applies to the apportionment of liability. *Getty Oil Co. v. USS Ponce De Leon*, 555 F.2d 328, 335 (2d. Cir.1977); *cf. Hanover Ins.*

**1.** Jurisdiction is under 28 U.S.C. § 1333.

Co. v. Puerto Rico Lighterage Co., 553 F.2d 728, 731 (1st Cir.1977) (Jury verdicts on percentages of negligence not entitled to a trial de novo; district judge reviewed verdict and found it was neither clearly erroneous nor grossly excessive).

The clearly erroneous standard also applies to depositions [2] and other documentary evidence. United States v. Gypsum Co., 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948); San Francisco Real Estate Investors v. Real Estate, 701 F.2d 1000, 1002 (1st Cir.1983).

We end our exposition of the standard of review by noting that a district court's application of an improper standard to the facts is to be corrected as a matter of law. United States v. Singer Mfg. Co., 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963).

## B. The Facts

Most of the facts are undisputed; it is the conclusions drawn from them by the district court that has drawn Sujeen's fire. The tanker, Manhattan Prince, was carrying 34,800 metric tons of fuel oil to San Juan. The vessel is 805 feet long, has a 124 foot beam, and at the time of the allision had a draft of approximately 32 feet, since she was fully loaded. The vessel was powered by a diesel engine with one righthand screw.

The Manhattan Prince was manned by Polish officers and crew. Neither the captain nor the two mates had been to San Juan Harbor prior to August 15, 1985, the date of the allision. None of the ship's officers spoke or understood Spanish. The compulsory pilot, Oscar Comacho, did not speak or understand Polish. He boarded the ship about 2½ miles from the entrance to San Juan Harbor at 7:12 p.m. (1912 hours). The pilot had never before docked a ship of the size of the Manhattan Prince. He did not know when he first went on board where the ship was to dock. He obtained this information by radio from Port Control.

At the time the pilot boarded the ship, darkness had fallen. After a discussion with the captain about the maneuverability and other characteristics of the vessel and the layout of San Juan Harbor, the pilot stationed himself in the port wing of the bridge. The captain moved back and forth across the bridge as conditions dictated. The pilot guided the ship by giving course and speed orders to the captain in English who relayed them in Polish to the crew member responsible for carrying them out. At times the pilot gave orders directly to a crew member. The second mate of the Manhattan Prince was on the bow. His responsibility was to act as a lookout and count down the distances as the ship approached the dock.

The course the ship followed was through the mouth of San Juan Harbor, down the Bar Channel to Anegado Channel, then a turn to port and down Anegado Channel to Army Terminal Channel. The ship then turned to starboard and followed Army Terminal Channel to the Army Terminal Turning Basin where it docked.

The tugs owned by Crowley, the Borinquen and El Morro, tied onto the tanker in Anegado Channel before she turned into Army Terminal Channel. The Borinquen was secured to the starboard bow with two lines; the El Morro was made fast to the starboard quarter. The tugs were manned by Puerto Ricans so the only one who could talk to the tug captains was the pilot which he did via a VHF radio in Spanish and "Spanglish," a combination of Spanish and English. From his position on the port wing of the bridge, the pilot was unable to see the Borinquen. The second mate who was stationed on the bow could see the tug but could not talk to its crew because of the language barrier and because his VHF radio, which enabled him to talk with the tanker captain, was on a different frequency from the radios of the pilot and the tug captains. This meant that the pilot could not hear the communications between the bow and the captain of the tanker, the tug captains could not hear the communications

---

**2.** A number of depositions were admitted in evidence, either in whole or in part. The most important were the complete depositions of the captain and second mate of the tanker.

between the tanker's captain and the bow, and the bow could not hear the communications between the tug captains and the pilot.

In addition to the communications problems, the ship was attempting to dock at night in a constricted area. It was commanded by a master who had never even seen San Juan Harbor prior to this, much less transited it by ship, and it was piloted by one who had never before guided a vessel of this size. This was a prescription for an accident.

The tanker and tugs proceeded down Army Terminal Channel to the turning basin. The basin is at the south end of the channel, which runs almost directly from north to south. At its widest point, the basin measures about 200 yards. The distance from the basin entrance to the pier at which the ship was to dock was approximately 400 yards.

Two piers jutted out into the water at the southern terminus of the basin. The Army Terminal pier, which was where the tanker was to dock, lay to the west of Catano pier. Both piers are about 150 yards long. The Catano pier is considerably narrower than the Terminal pier. The piers are about 100 yards apart. The depth of the basin is between twenty-eight and thirty-nine feet. On the west side of the Terminal pier, where the ship was to be docked, the water depth is thirty-six to thirty-seven feet.

There are two buoys on the east side of the basin, numbered 7 and 9, marking the beginning of shallow water (3 to 5 feet). It must be kept in mind that the ship was a little more than 268 yards long, its beam was 41.3 yards and it had a draft of about 32 feet. There was not much room for maneuvering.

When the tanker entered the turning basin, it was moving forward. The estimates of its speed vary from less than 1 knot to 4 knots. The first task for the ship and tugs was to keep the stern from going aground in the shallow waters marked by buoys 7 and 9. This was accomplished. The ship, which continued to move forward, had to be positioned so that it would dock with its port side next to the Terminal pier. This

meant that it had to be moved to the starboard (west) of the Catano pier and then just past the Terminal pier so its port side could be nudged against the pier. The ship continued its forward and sidewards motion past the Catano pier. At some point, the pilot asked the captain of the tug Borinquen how far the ship was from the pier. When it was about fifty feet from the Terminal pier, the tug Borinquen cast off its lines and backed off. There is a dispute as to how far and in what direction the tug moved. The ship continued forward and struck the front of the Terminal pier at a 90% angle—head on. The Borinquen picked up the lines and the ship, which was now dead in the water, was brought alongside the Terminal pier and docked.

## C. *The Findings and Conclusions of the District Court*

The district court found that the allision occurred because the vessel was travelling too fast down Army Terminal Channel and was not slowed down sufficiently for a safe docking. The court did not credit the testimony of the pilot that he had ordered slow astern at buoy number 6 in the channel, which is about 900 yards from the dock. The court's conclusion as to the pilot's negligence was as follows:

The pilot's negligence and failure to exercise due care in docking the vessel was a proximate cause of the allision which caused damages to the "MANHATTAN PRINCE" and the dock facilities. The pilot was negligent in attempting to dock the vessel at an excessive speed. Due to the large size of the vessel, the restricted space in the turning basin, and the pilots, [sic] lack of previous experience in docking a vessel the size of the "MANHATTAN PRINCE," the proper method would have been to stop the tanker dead in the water before attempting the final maneuvers to the dock. A prudent pilot would have proceeded with extreme caution given the situation.

The court's assessment of liability on the part of the ship was stated thus:

The Court has found that distances were not relayed to the pilot by the master even though the bow watch was relaying the distances of the master upon approaching the dock. The pilot was forced to request a distance report from the captain of the "BORINQUEN" at a time when the vessel was too close to impact to matter. Whether this lack of communication resulted from the mishmash of languages being spoken over the various radios, from the inconsistency occurring in the pilot sometimes giving commands through the master and sometimes directly, as evidenced by the statement of the chief officer who was stationed on the lee helm on the bridge, or from sheer negligence on the part of the master, this crucial information did not reach the pilot's ears. Responsibility for this omission must be attributed to the "MANHATTAN PRINCE." Thus, the ship's failure to report distances to the pilot, under these circumstances, was also a proximate cause of the allision. Had the pilot been better apprised of the ship's proximity to the dock and of the rate of the rapidly decreasing distances he could have better judged the ship's speed and distance and taken appropriate maneuvers to avoid allision.

In concluding that the tug Borinquen's actions were not a proximate cause of the allision, the court found that the tug was "*in extremis*." It stated:

The extremely close passage by the Catano Oil Dock, her [the tug's] position near the bow of the tanker, and the tanker's massive size and continued forward way and 90° angle to the dock at a position only 30–50 feet from the dock, all conspired to put the "BORINQUEN" *in extremis.* The captain of the "BORINQUEN" was reasonable in letting go the lines. Whether the allision could have been avoided or mitigated if the "BORINQUEN" had held steady is mere speculation. The captain of the "BORINQUEN" cannot be held negligent for not choosing to risk his tug or the lives of his crew by holding fast to the ship while it allided with the dock.

### D. *The Issues*

Sujeen mounts a four-pronged attack on the negligence findings of the district court: (1) the district court misapplied the *in extremis* doctrine and therefore the tug Borinquen should have been found negligent for casting off its lines when it did; (2) the Manhattan Prince was not negligent; (3) the admission in evidence of the Coast Guard's report of the accident was error; and (4) the tug Borinquen breached its implied warranty of performance in a workmanlike manner and is therefore liable for the damages suffered by the tanker. We reject all four claims and affirm the district court's negligence findings.

We note at the outset that although appellant pays lip service to the clearly erroneous standard, its brief is written as if we were reviewing the facts *de novo;* its oral argument also proceeded on the same tack.

### (1) The In Extremis Finding

The doctrine of *in extremis* has long been a part of admiralty law. In *The Blue Jacket,* 144 U.S. 371, 392, 12 S.Ct. 711, 719, 36 L.Ed. 469 (1892), the rule was stated as follows:

As was held in *The Bywell Castle,* 4 Prob.Div. 219, "where one ship has, by wrong manoeuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been manoeuvred with perfect skill and presence of mind."

The doctrine was invoked again by the Court in *The Oregon,* 158 U.S. 186, 204, 15 S.Ct. 804, 812, 39 L.Ed. 943 (1895), where it stated, "the judgment of a competent sailor *in extremis* cannot be impugned." In *Bucolo, Inc. v. S/V Jaguar,* 428 F.2d 394, 396 (1st Cir.1970), we stated: "This doctrine is applicable only when the party asserting it was free from fault until the emergency arose." One of the most recent applications of the doctrine was in a case remarkably similar to this one, *Chevron U.S.A., Inc. v. Vessel J. Louis,* 702 F.Supp. 887 (M.D.Fla.1988). The court there found that the allision occurred because of "the negli-

gence of the pilot and vessel master in navigating the vessel at an excessive rate of speed so that she ran aground...." *Id.* at 891. As here, there was a tug tied to the vessel, and it loosened its line to the vessel to avoid being crushed against the dock. The court found the tug to be without fault, stating:

> The tug was placed, by the pilot and master of the vessel, in a position of sudden peril and emergency, which situation did not arise as a result of the tug's own previous fault. Therefore, even if the Court were to decide that the Tampa was somehow negligent in failing to keep the towline from slipping as it backed full astern, as the pilot ordered, such alleged negligence must be excused under the *in extremis* doctrine.

*Id.* at 891.

■ There was no misapplication of the *in extremis* doctrine here. The captain of the tug Borinquen testified in effect as follows: He had no problem communicating with the pilot. After the ship cleared the Catano dock, the pilot told him to stop pushing. At that time, the tug was between the head of the Catano dock and the bulkhead of the terminal pier. He told the pilot that he was about 50 feet from the pier, that there would be a collision, and he was going to release the lines because the tug was in danger. It was his judgment that if the tug had not backed away from the tanker, it would have been sandwiched between the tanker and the Catano pier.

Robert Leith, shipping agent for the Manhattan Prince, was on the pier waiting for it to dock. He testified that the ship approached the pier at a steady speed of between four and seven knots. He had seen vessels dock at this pier for thirty years and they approached at much less speed and much less under the control of tugs. Leith testified that the bow tug (Borinquen) "got out of there" when its captain saw that there was going to be a collision with the dock. It was Leith's testimony that the tug dropped its lines and backed away from the tanker, when the vessel was 50 to 60 feet from the pier.

It was the opinion of expert witness John Deck III that even if the tug Borinquen had not dropped the lines, the tanker would still have hit the pier.

Captain Stillwaggeon, an expert witness with extensive experience as a pilot, testified that if the tug had not dropped its lines it would have been endangered. He further testified that the tug did not desert the ship, but simply moved to a safe position and that the tug could not have prevented the collision.

From this evidence the court could have found that the tug did not do anything to create the emergency, that the safety of the tug and its crew was put in peril as the ship continued forward towards the piers and that casting off the lines was a reasonable response to the danger thrust upon the tug by the tanker.

The testimony is more than sufficient to sustain the district court's finding that the tug Borinquen was *in extremis* when it cast off the lines and therefore did not act negligently.

(2) The Negligence of the Manhattan Prince

■ The district court invoked a presumption of negligence against "all parties participating in the management of the vessel" because the vessel was moving and collided with a stationary object. It specifically found that the presumption applied to the tug Borinquen and the pilot as well as the vessel. It found that only the Borinquen overcame the presumption because it went forward and proved that when it cast off the lines, it was *in extremis*. The court found that neither the ship nor the pilot overcame the presumption.

This presumption of negligence goes back at least to *The Louisiana*, 70 U.S. 164, 18 L.Ed. 85 (1865). In that case the Court held:

> The streamer Flushing being aground on Hampton Bar, out of the channel or course of vessels navigating the bay or harbor, and incapable of motion, cannot be justly charged with any participation in causing the collision.

The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented.

*Id.* at 173. *See Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1347 (9th Cir. 1985). Although the circumstances here did not involve a vessel that had broken loose from her moorings as in *The Louisiana* and *Atropos Island*, it was not error to invoke the presumption against the Manhattan Prince. When a fully manned vessel accompanied by two tugs strikes a pier head-on, it ought to be presumed, unless the vessel proves otherwise, that the vessel was negligent. Under the facts here, however, considering especially the communication obstacles between the pilot, the ship's officers and the tug and the evidence of the speed of the ship in the turning basin, no presumption of negligence was needed; with or without such presumption the pilot and the ship were clearly negligent.

There is no reason to regurgitate the evidence establishing the tanker's negligence. We have read the entire record, including all depositions bearing on the issue and have examined carefully all pertinent exhibits. We hold that the district court's finding that the Manhattan Prince was 50% at fault was not clearly erroneous.

(3) The Coast Guard Report

The United States Coast Guard investigated the accident. Its report of the accident was admitted in evidence. The report gives three conclusions as to the cause of the accident: the use of improper speed by the pilot, the failure of the master of the Manhattan Prince to take over command and control of the vessel from the pilot, and the action of the tug Borinquen in dropping its lines. Appellant argues that the admission of the report in evidence was error.

Both sides agree that *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), controls the admissibility of the report. *Rainey* concerned the admission in a jury trial of an investigative report by the Navy of a plane crash. The court held:

> We hold, therefore, that portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report.

*Id.* 109 S.Ct. at 450 (footnote omitted).

Although the report here states, "a narrative report will not be submitted," there is no doubt that the Coast Guard made a full investigation of the allision. That a narrative report was not submitted does not mean that an investigation was not made. The deposition of Wilfredo Aleman, the Coast Guard officer who investigated the accident, was admitted in evidence. He questioned the ship's officers, the pilot, and the captain of the tug Borinquen within a short time after the accident. There can be no serious question as to the trustworthiness of the report.

But even if the report's conclusions were inadmissible under *Rainey*, as appellant argues, there is another factor to the equation. In its opinion the district court dropped a footnote with the signal at the end of the following sentence: "The pilot was negligent in attempting to dock the vessel at an excessive speed." The footnote reads: "Though the Coast Guard report on the allision came to the same conclusion, and was admitted into evidence, the Court made its own conclusion based on all the evidence submitted and presented at trial. Only the fact-based portions of the report were considered by the Court." We accept, of course, the court's statement that it relied on the trial evidence, not the report, for its conclusions. We point out that except as to the pilot, the court's negligence conclusions differed markedly from those of the Coast Guard. Thus, even were the admission of the report error, it was harmless.

(4) Breach of the Tug Borinquen's Implied Warranty of Performance in a Workmanlike Manner

Because this issue was not raised below, we do not reach it. *See Clauson v. Smith,* 823 F.2d 660, 666 (1st Cir.1987); *United States v. Ven Fuel, Inc.,* 758 F.2d 741, 760 (1st Cir.1985); *McPhail v. Municipality of Culebra,* 598 F.2d 603, 607 (1st Cir.1979); *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979). Moreover, it seems obvious that the *in extremis* finding, which we have upheld, swallows this issue completely.

## II. LIABILITY OF PUERTO RICO PORTS AUTHORITY FOR PILOT NEGLIGENCE

The district court ruled that the defense of sovereign immunity was not available to the PRPA. It also held that the PRPA was not vicariously liable to Sujeen, owner of the Manhattan Prince, under the doctrine of *respondeat superior,* for the negligence of the pilot. *Puerto Rico Ports Authority v. M/V Manhattan Prince,* 669 F.Supp. 34 (D.P.R.1987). For the reasons that follow, we hold that the shield of sovereign immunity as embodied in the eleventh amendment insulates the PRPA against liability. This does not mean that the district court labored in vain because we have found its findings and rulings pertinent to the question of sovereign immunity.

■ The general principles applicable to sovereign immunity and the protection afforded to states against suits by the eleventh amendment are well settled. The significance of the eleventh amendment "lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). Absent abrogation by Congress or waiver by the state, the eleventh amendment insulates states from damage suits in federal court. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). And the protection of the eleventh amendment is in no way altered or reduced when the suit is based on admiralty jurisdiction. *Lane v. First Nat. Bank of Boston,* 871 F.2d 166, 173 (1st Cir.1989).

That these principles apply to the Commonwealth of Puerto Rico is beyond dispute. "The Commonwealth of Puerto Rico is treated as a state for Eleventh Amendment purposes." *In re San Juan Dupont Plaza Hotel Fire Litigation,* 888 F.2d 940, 942 (1st Cir.1989); *see also Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir.1983).

■ We now move from the general to the specific: is the PRPA entitled to eleventh amendment immunity. The factors going into this determination and the case law establishing them have been summarized in *Ainsworth Aristocrat Intern. Pty. v. Tourism Co.,* 818 F.2d 1034, 1037 (1st Cir.1987): local law and decisions defining the nature of the agency involved; whether payment of any judgment will come out of the state treasury; whether the agency is performing a governmental or proprietary function; the agency's degree of autonomy; the power of the agency to sue and be sued and enter into contracts; whether the agency's property is immune from state taxation and whether the state has insulated itself from responsibility for the agency's operations. *See also Figueroa–Rodriquez v. Aquino,* 863 F.2d 1037, 1044 (1st Cir.1988).

■ We first examine the Puerto Rico statute establishing and defining the authority of the PRPA. The PRPA consists of the Governor of Puerto Rico, the Secretary of Transportation and Public Works of Puerto Rico and the Secretary of Agriculture and Commerce of Puerto Rico. The members of the PRPA are not entitled to compensation for their services. The PRPA is a successor to the Puerto Rico Transportation Authority. It is a governmental instrumentality and public corporation. P.R.Laws Ann. tit. 23, ch. 25 § 333(a) & (b). The executive powers of the PRPA are exercised by the Economic Development Administrator. *Id.* § 334. The purpose of the PRPA is to "develop and im-

prove, own, operate and manage any and all types of transportation facilities and marine services in, to and from ... Puerto Rico and to make available the benefits thereof in the widest economic manner; thereby promoting the general welfare...." *Id.* § 336. Following this general statement is a detailed listing of the PRPA's specific powers. *Id.* Among its powers are: "to sue and be sued, § 336(e); to raise revenue through rents and fees, § 336(*l*)(1), or through the issuance of bonds, § 336(*o*) and § 342, and to acquire real and personal property for its use. § 336(h)–(j). Section 338 provides in pertinent part: "All moneys of the Authority shall be deposited in qualifed [sic] depositaries for funds of the Commonwealth Government, but they shall be kept in a separate account or accounts in the name of the Authority." Section 339a gives the PRPA the authority to acquire property through condemnation procedures.

There is another statute bearing on the question of sovereign immunity, the Dock and Harbor Act of 1968, P.R.Laws Ann. tit. 23, ch. 101. Its pertinent provisions follow. The PRPA is in charge of the execution and administration of the Act and "all sums collected under its provisions shall be covered [sic] into the funds of the Authority." *Id.* § 2105. The PRPA is given "control of the navigation and of the marine trade in navigable waters of Puerto Rico in its harbors and docks as provided in this chapter." *Id.* § 2201. There is a section limiting the liability of individual members, employees and agents of the PRPA:

The damages caused through the action or omission of the Administrator or of any officer, employee or agent of the Authority, while acting in his official capacity and within the scope of his function, employment or commitment as an agent of the Government of the Commonwealth of Puerto Rico under the provisions of this chapter (in contraposition as when acting in the exercise of the property rights of the Authority as a public corporation) intervening fault or negligence, shall exclusively be requirable [sic] to the Commonwealth of Puerto Rico as provided by law.

*Id.* § 2303(b). "The pilot service in the harbors of Puerto Rico shall be under the control of the Authority." *Id.* § 2401. The PRPA has the power to issue, suspend and revoke pilot licenses. *Id.* §§ 2406 & 2407. Puerto Rico is a compulsory pilot jurisdiction. No ship, with specific exemptions not applicable in this case, may enter or leave a harbor of Puerto Rico "without obtaining pilot service from a pilot licensed by the Authority for said harbor." *Id.* § 2412.

The following undisputed findings were made by the district court based on a stipulation filed by the parties and evidence introduced at trial.

PRPA does not have the power to control the actions of the pilot while he is on the bridge. For the services of the pilot, the shipowner or agent pays a fee directly to the pilots and also into a trust fund, created by PRPA, for the pilots' pension. Fees are set by PRPA after a public hearing before a Hearing Officer named by the Secretary of Transportation and Public Works. The pilots set their own monthly schedule in advance and notify PRPA of it. Any last minute changes in the schedule are made among the pilots themselves. Ships have no choice between pilots. The pilots pay rent to PRPA for the use of their pilot house. Pilots provide their own pilot boats and other equipment.

*Puerto Rico Ports Authority v. M/V Manhattan Prince,* 669 F.Supp. at 37.

After examining the pertinent statutes, we conclude that whether the PRPA is entitled to eleventh amendment protection depends upon the type of activity it engages in and the nature of the claim asserted against it. The specific question here is whether the PRPA's relationship with ship pilots is a proprietary function or one exercised as an arm of the state.

The district court in denying the defense of sovereign immunity to the PRPA simply stated that the issue was "resolved" by *Canadian Transport Co. v. Puerto Rico Ports Authority,* 333 F.Supp. 1295 (D.P.R. 1971). While the court in *Canadian Transport* held that the PRPA was a "pub-

lic corporation with sufficient identity and distinction, vis-a-vis the Commonwealth government, so as to be liable to be sued herein," *id.* at 1297, the court also recognized that such may not always be the case. The court stated that the PRPA "did not demonstrate that its specific activities which gave rise to this case are governmental actions, vis-a-vis proprietary actions, to use the dichotomy resorted to in defendant Authority's memorandum. Rather, the allegations merely point out that some of the Authority's activities are governmental." *Id.* at 1296. Unfortunately, the court failed to include any of the underlying facts on which it based its holding, thereby rendering its precedential value minimal for our purpose.

The district court held that the PRPA's function of providing harbor pilots was proprietary. It based this holding on a Ninth Circuit case, *City of Long Beach v. American President Lines*, 223 F.2d 853 (9th Cir.1955), the facts of which are similar to the case at bar. A shipping company sued both the compulsory pilot and the City of Long Beach for damages arising from an allision between one of the company's ships and a pier. *Id.* at 855. The court determined that Long Beach in maintaining and operating its harbor, which included the compulsory use of harbor pilots, was engaged in a proprietary function. *Id.* at 856. In part, this determination stemmed from the fact that the city received full payment from the ships for the pilot service and then remitted the company furnishing the pilots service sixty percent of the payment and retained forty percent for itself. *Id.* at 857 n. 4.

The Ninth Circuit later distinguished this holding in *Kitanihon—Oi S.S. Co. v. General Const. Co.*, 678 F.2d 109 (9th Cir. 1982). In *Kitanihon*, a shipping company claimed that the city port authority should be liable for the negligent actions of a compulsory pilot. The issue before the court did not involve eleventh amendment immunity [3] but was whether there was an "implied warranty of nonnegligent per-formance" between the port authority and the ships using the pilot service. *Id.* at 110. In addressing this issue, the court examined whether the port authority's compulsory pilotage requirement was proprietary in nature. In finding the port authority not liable, the court distinguished the *City of Long Beach:*

The present case differs from *City of Long Beach* in one significant way. Here, Shipowner paid the pilot directly, and the Port itself paid no fees to the pilot. The Port commissions a limited number of pilots in order to protect the earning capacity of those commissioned, who in February 1977 numbered eight. The standard pilot's fee schedule is arrived at by negotiations between the Bay Area pilots and the maritime steamship associations conducted at meetings which the Port attends. Shipowners must use a commissioned ship's pilot to comply with the compulsory pilotage clause of the Port's tariff. The Port's primary relationship with the pilot is as the source of his commission, which the pilot holds at the pleasure of the Port through its Pilot Advisory Board. While the Port's power to decommission a pilot temporarily or permanently at its sole discretion gives teeth to its rules and regulations governing commissioned pilots and use of the Channel, the Port does not hire the pilot either directly or indirectly.

*Id.* at 111 (footnotes omitted). This arrangement between the port authority and the pilots is strikingly similar to the one in Puerto Rico.

Appellant makes two arguments for holding the PRPA liable for the negligence of the pilot. It first contends that the PRPA should be found to be a surety of the pilots because it failed to comply with the statutory mandate requiring the posting of a sufficient bond. The argument runs as follows: Under The Dock & Harbor Act, P.R.Laws ann. tit. 123, ch. 101 § 2405, the PRPA is forbidden to issue a pilot's license or renew one unless the applicant

---

**3.** The protection of the eleventh amendment does not extend to municipalities. *See Mt.* *Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 281, 97 S.Ct. 568, 573, 50 L.Ed.2d 471 (1977).

"renders a bond to the satisfaction of the director [of the PRPA] for a reasonable sum ... to answer for the faithful compliance of his duties as pilot." Section 2410 of the Act provides that any pilot causing damages to another person or to the PRPA shall be civilly responsible, and section 2411 provides that the damage liability of a pilot shall be a lien against his bond. The amount of a pilot's bond required by the PRPA at the time of this accident was $5,000, an amount appellant contends was totally inadequate. Moreover, appellant avers, the bond was useless because it stated: "It is further understood and agreed that this bond guarantees the faithful performance of the PRINCIPAL'S duties and responsibilities as Port Pilot and not the damages that he may cause due to his fault or negligence."

Appellant argues that the amount of the bond and its exculpatory clause violated the purpose and requirements of a bond for pilots, and, therefore, the PRPA must become surety for the pilots. It cites as authority for this proposition, *Hanover Insurance Company v. Liberian Oceanway Corp.*, 398 F.Supp. 104 (D.P.R.1975). In *Hanover*, a pilot had not been required to post a bond by the PRPA, contrary to the requirements of section 2405 of The Dock & Harbor Act. The ship the pilot was guiding hit the cassion gate of a dry dock while maneuvering to dock. The court held:

> Since the Ports Authority, through its negligent omission has, in effect, waived the bond requirement for harbor pilots, then it is only fair and equitable that it warrants to vessel owners and operators, and the owners of pier's [sic] facilities within Puerto Rico, that it (Ports Authority) will guarantee payment of damages caused by the improper performance of a harbor pilot in carrying out his duties.

*Id.* at 108. Appellee PRPA states baldly that *Hanover* "is bad law and should be overturned."

We find it hard to square this holding with P.R.Laws Ann. tit. 23, ch. 101, § 2303(b) stating that a negligent act or omission of a member of the PRPA, while acting in his official capacity and within the scope of his function as an agent of the government of Puerto Rico, is attributable only to the Commonwealth of Puerto Rico. Moreover, there is no discussion in the case of the eleventh amendment and sovereign immunity. We decline to follow *Hanover* and reject appellant's surety argument.

Appellant's second argument is more straightforward: the district court erred as a matter of law in holding that the PRPA could not be found liable for pilot negligence. We agree with the district court that there can be no *respondeat superior* liability by the PRPA for the negligence of a pilot in taking a ship into a harbor of Puerto Rico. We endorse its rulings that:

> PRPA's control is aimed at ensuring safe passage through the harbor. Its functions are related to licensing and the competency of pilots. PRPA acts like a public service commission, setting and enforcing standards within the industry (harbor services in general and pilotage in particular).

*Puerto Rico Ports Authority v. M/V Manhattan Prince*, 669 F.Supp. at 37.

We hold, however, contrary to the district court, that in its relationship with pilots, the PRPA acts as an arm of the state and not in a proprietary manner. The PRPA, under The Dock & Harbor Act, has the duty to license pilots. Its sanction for the negligence of a pilot is suspension or revocation of a pilot's license. Although the PRPA has the duty to examine the qualifications of a pilot before issuing a license, it does not train pilots. It has no control over pilot ship assignments. The PRPA derives no revenue from the compulsory pilot system.

After consideration of PRPA's enabling statute, The Dock & Harbor Act of 1968 and the pertinent case law, we hold that in its relationship with pilots the PRPA acts as arm of the Commonwealth. It follows that the eleventh amendment is a bar to the action by appellant against it.

*Affirmed.* Costs awarded to appellees.