McLELLAN HIGHWAY
CORPORATION,
Plaintiff,

v.

UNITED STATES of America, United
States Department of Defense, De-
partment of the Navy, Defendants.

No. CIV. A. 98–12142–DPW.

United States District Court,
D. Massachusetts.

March 28, 2000.

Richard A. Johnston, Mark C. Kalpin, Hale & Dorr, LLP, Boston, MA, for plaintiff.

Andrew J. Doyle, Environment & Natural Resources Division, Henry T. Miller, Wealthia Rodriguez, Civil Division, United States Dept. of Justice, Washington, DC, for defendants.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff McLellan Highway Corporation ("McLellan") brings this action against the United States under the Federal Torts Claim Act (FTCA) and Massachusetts state law for reimbursement of cleanup costs incurred on oil contaminated property previously owned and used by the Navy as a strategic fuel reservation in the 1940s and 1950s. The United States has moved for dismissal or, in the alternative, summary judgment. McLellan has cross-moved for partial summary judgment.

## I. BACKGROUND

### A. The Parties

The United States owned eighty acres of property in East Boston known as the Naval Fuel Annex from 1942 to 1964. The United States Department of Defense, Department of the Navy (the "Navy") is alleged by Plaintiff to have committed the acts which form the basis of Plaintiff's complaint.

McLellan is incorporated under the laws of Massachusetts with its principal place of business in East Boston. (Compl.¶ 5.) McLellan owned approximately six acres of property located at 345–365 McClellan Highway in East Boston (hereinafter "the Site"). (*Id.* ¶ 11.) McLellan's corporate

predecessor, East Boston Parking, Inc., purchased the Site in 1984 for $1 million from Grossman Industrial Properties, Inc. ("Grossman"). (*Id.* ¶¶ 5, 11–12.) McLellan sold the property in November 1997 for $3.5 million to Logaland Corp., a nonparty to this action. (United States' Statement of Undisputed Facts in Supp. Mot. to Dismiss or for Summ. J. ("United States 1st Facts"), Ex. 16 (Florence Dep.) at 62:13–19.)

### B. The History of the Site

The Navy acquired approximately eighty acres of property located in East Boston in 1942, by a declaration of taking for use as a strategic fuel reservation known as the Naval Fuel Annex. (Compl. ¶ 8; United States 1st Facts ¶ 2.) Fuel unloaded from Navy vessels was stored at the Naval Fuel Annex and later pumped through pipelines to Boston Harbor to refuel other naval vessels. (United States 1st Facts ¶ 3.) To carry out these operations, the Navy constructed nineteen underground fuel oil storage tanks, associated fill and transfer piping, steam heating pipes, and small above ground service buildings. (Compl. ¶ 9; United States 1st Facts ¶ 4; McLellan Statement of Undisputed Facts in Supp. Partial Summ. J. Motion ("McLellan 1st Facts") ¶ 2.)

In the mid–1950s, the Navy determined that the Naval Fuel Annex was no longer needed. Consequently, the facility was deactivated and reported to the United States' General Service Administration (GSA) as surplus property in December 1955. (Compl. ¶ 10; United States 1st Facts ¶ 6; Ex. 6 at 1.) The entire facility was shut down by November 1961. (United States 1st Facts ¶ 6.)

Shortly after its closing, the former Naval Fuel Annex was put up for sale by the GSA through a bidding process in which the facility was offered "as is" and without any express or implied warranties. (United States 1st Facts ¶ 7; Ex. 7 at BostAR 70.) In June 1964, GSA awarded the sale of the former Naval Fuel Annex to Grossman. (Compl. ¶ 11; United States 1st Facts ¶ 8.)

Grossman owned the property from 1964 to 1984. (United States 1st Facts ¶ 11.) In 1982, East Boston Parking, the corporate predecessor to McLellan, entered into an option agreement to purchase a portion of the former Naval Fuel Annex located at 345–365 McClellan Highway. (*Id.* ¶ 11; Ex. 13.) When East Boston failed to carry out the agreement, Grossman sued East Boston Parking in Suffolk Superior Court in 1983 for breach and sought specific performance on the agreement. (*Id.* ¶ 11; Ex. 14.) The litigation settled and East Boston Parking purchased the property for $1 million in 1984. (*Id.* ¶ 12.) As part of the sale, Grossman and East Boston Parking entered into an indemnity agreement in which Grossman agreed

> to indemnify and hold East Boston harmless from and against all loss, cost, damage and expenses (including, without limitation, reasonable attorneys' fees) arising out of any claim against East Boston (including without limitation the defense thereof) resulting from releases of oil, hazardous materials, or any other illegal toxic substances from the premises during the period from January 1, 1941 through [May 1, 1984].

(*Id.*, Ex. 18.) At the time of the purchase, East Boston Parking was aware that the Site had been part of the Naval Fuel Annex, but was allegedly unaware that the tanks and pipelines were still present underground at the Site. (McLellan 1st Facts ¶ 4, Ex. 1 ("Florence Aff.") ¶ 7.)

### C. The Site Clean-up

McLellan (f/k/a East Boston) intended to develop the Site as a commercial parking lot for nearby Logan International Airport. (McLellan 1st Facts, Florence Aff. ¶ 6.) To do this, McLellan needed a licensing permit from the City of Boston which could only be obtained by supplying a report from an environmental consultant stating the land was free of hazardous materials in compliance with Chapter 21E,

the Massachusetts Oil and Hazardous Material Release Act (MHRA). McLellan hired Goldberg–Zoino & Associates, Inc. (GZA), an environmental consulting firm to inspect the Site in 1984. (*Id.* ¶ 7; Ex. 7.) The report prepared by GZA notified McLellan of oil contamination on the Site. (*Id.;* Compl. ¶ 13.) McLellan then undertook remediation efforts. Specifically, McLellan hired Euclid Associates, Inc. ("Euclid") in late 1985 to remove the tanks at the Site and remediate any environmental contamination that was present. (McLellan 1st Facts ¶ 7.)

Euclid's work was documented in reports by K.H. Lewis and Associates ("K.H.Associates"), another environmental consulting firm. (*Id.* ¶ 8.) McLellan filed those reports with the Massachusetts Department of Environmental Quality Engineering (DEQE).[1] (*Id.*) In response to the submissions made by McLellan's environmental consultants, the DEQE in a letter dated July 31, 1987, issued a Notice of Responsibility to McLellan pursuant to Chapter 21E. (*Id.* ¶ 11; Ex. 11.) The letter notified McLellan that there was evidence of soil and groundwater contamination at the Site, and directed McLellan, as the current owner of the Site, to develop a remediation plan. (United States 1st Facts, Ex. 19.)

McLellan undertook further response actions to remediate the oil contamination at the Site. Those actions included pumping out the underground tanks, demolishing them to at or below grade, and filling the remaining areas with clean fill. (Compl. ¶ 14.) In total, between 1984 and 1989, McLellan spent $831,641.60 for response actions at the Site. (*Id.* ¶ 18.)

On June 14, 1989, the DEQE sent a letter to McLellan informing it that "all the requisite site actions" had been completed at that time. (United States 1st Facts, Ex. 20.) The letter informed McLellan, however, that "the federal government, as part of their Defense Environmental Restoration Program, may be con-

ducting its own investigation of the Old Naval Fuel Depot." (*Id.*) Accordingly, "the Department reserve[d] the right to allow the federal government to conduct a further assessment and/or any additional measures, as needed, as part of their investigation of the *adjacent* properties which comprise the Old Naval Fuel Depot." (*Id.*) (emphasis added).

The United States also received a Notice of Responsibility communication from the DEQE in 1987. (McLellan 1st Facts, Ex. 19.) Shortly thereafter, the United States responded that the existence of the Site was unknown until receipt of the DEQE letter. (*Id.*, Ex. 20.) The Government went on to state that a project recommendation of the Site would be made to the Office of the Secretary of Defense by the end of 1987. (*Id.*) The United States Army Corps of Engineers ("the Corps") then began investigating whether the properties that were once part of the Naval Fuel Annex were eligible for federally funded and supervised remediation under the Defense Environmental Restoration Program (DERP), 10 U.S.C. §§ 2701–08, which became effective on or about 1984. (*Id.* ¶ 18.) The relevant eligibility requirements were:

(1) former use by the United States as a defense site;

(2) the existence of containerized hazardous and toxic waste; and

(3) no beneficial use of the tanks and pipelines by subsequent owners that would supersede the United States' responsibility under the DERP.

(*Id.* ¶ 18, Ex. 22 at 32:22–24, 33:1–24, 34:1–3.) In or about February 1990, the Corps found the former Naval Fuel Annex to be eligible under these criteria. (*Id.* ¶ 18, Ex. 23) In 1995, the Corps began conducting remediation on the Site. (*Id.* ¶ 19.)

### D. Course of Proceedings

McLellan had several discussions with the Navy and the Corps regarding the

---

1. The DEQE has since been renamed the Department of Environmental Protection (DEP).

reimbursement of McLellan's expenses[2] and the Corps' proposed imposition of an Activity and Use Limitation ("AUL") on the site to minimize the need for additional response expenditures by the Navy.[3] (Compl.¶ 19.)

On August 4, 1997, McLellan filed a claim under the FTCA for reimbursement of its remediation expenses with the Naval Facilities Engineering Command (NFEC).[4] (United States 1st Facts, Ex. 21.) The Navy received the claim on September 15, 1997. (*Id.* ¶ 20.) The claim was denied on March 3, 1998, on the grounds that the claim was barred by the two-year statute of limitations under the FTCA. In the meantime, McLellan had sold the property in November 1997. (*See* United States 1st Facts, Ex. 16, Florence Dep., at 62:13–19.)[5] In response to that denial, McLellan asked the Navy to reconsider its decision, asserting that the running of the statute of limitations under the FTCA must be determined by reference to Chapter 21E. According to McLellan, that statute of limitations had not run, and McLellan's claim, therefore, was not barred. (Compl.¶ 22.) The Navy denied McLellan's request for reconsideration on April 27, 1998. (*Id.* ¶ 23; United States 1st Facts ¶ 20.) The Navy advised McLellan that any suit filed pursuant to the FTCA would have to be filed within six months of the date of the denial of reconsideration. (Compl.¶ 23.)

McLellan filed suit in this court on October 23, 1998. McLellan claims it is enti-tled to recover cleanup costs against the United States under the FTCA and Chapter 21E of Massachusetts General Laws (Count I), under Chapter 21E independently (Count II), and under the FTCA for the government's negligence (Count III). McLellan seeks reimbursement of cleanup costs totaling $831,641.60. (Compl.¶ 18.)

Before me are the following motions:

(1) Defendant's motion to dismiss pursuant to Rule 12(b)(1) and (6) or, in the alternative, for summary judgment pursuant to Rule 56 on all counts against it;

(2) Plaintiff's motion for partial summary judgment pursuant to Rule 56(a) on Counts I and II; and

(3) Plaintiff's motion to strike various exhibits offered by Defendant in support of its motions.

## II.  STANDARD OF REVIEW

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

The motion of the United States to dismiss for lack of subject matter jurisdiction asserts three jurisdictional challenges to McLellan's FTCA claims: (1) that McLellan's claim is time barred by the statute of limitations in 28 U.S.C. § 2401(b); (2) the discretionary function exception to the FTCA's waiver of sovereign immunity applies; and (3) the FTCA does not provide a basis for relief for McLellan.

Ordinarily, a motion challenging subject matter jurisdiction is analyzed as a motion under Rule 12(b)(1). However, "if juris-

---

**2.**  McLellan has not received any indemnification from Grossman or attempted to have Grossman indemnify it pursuant to the Indemnity Agreement. (United States 1st Facts, Ex. 22, Florence Dep. at 35:7–17.)

**3.**  An Activity Use Limitation (AUL) functions like a deed restriction imposed by the owner of property defining limits on use of the property. AULs are used as economy savers in remediation—an owner or other party can avoid or minimize the need to do additional remediation by restricting the property to uses that would not be incompatible with the contaminants on the property. (United States 1st Facts, Ex. 22, Riccio Aff. at 137: 10–24, 138:1–20.)

**4.**  McLellan's complaint states the claim was filed on August 12, 1997. (Compl.¶ 20.) August 12th is the date of a letter sent to the defendant informing it that a claim had been filed. (McLellan's 1st fact, Ex. 40.) The copy of the claim form submitted by the Government shows that the actual date was August 4. (United States 1st Facts, Ex. 21.)

**5.**  In his affidavit, Florence appears to incorrectly state the year as November 1998. (See McLellan 1st Facts, Ex. 1 ¶ 17.)

dictional issues cannot be separated from the merits of the case, then consideration of matters outside the pleadings transforms the motion into one for summary judgment." *Jones–Booker v. United States*, 16 F.Supp.2d 52, 58 n. 9 (D.Mass. 1998). *See also Espinosa v. DeVasto*, 818 F.Supp. 438, 440 (D.Mass.1993)(suggesting that where a motion to dismiss for lack of subject matter jurisdiction raises issues going to the merits of the case, the motion should be treated as a motion for summary judgment); *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir., 1995) ("[W]here resolution of the jurisdictional question is intertwined with the merits of the action, a court is required to treat the motion as one for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), or as one for summary judgment pursuant to Fed.R.Civ.P. 56"); *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir.1987) (stating when facts relevant to the determination of subject matter jurisdiction go directly to the merits of plaintiff's claim, the district court should apply summary judgment standards to the motion to dismiss for lack of subject matter jurisdiction).

The jurisdictional issue is intertwined with the merits of the action where the court's subject matter jurisdiction depends upon the same statute which governs the substantive claims in the case. *Holt*, 46 F.3d. at 1003. *See also Clark v. Tarrant County*, 798 F.2d 736, 742 (5th Cir.1986) ("The questions of subject matter jurisdiction and the merits will normally be considered intertwined where the statute provides both the basis of federal court subject matter jurisdiction and the cause of action"); *Sun Valley Gasoline, Inc. v. Ernst Enterprises*, 711 F.2d 138, 139 (9th Cir.1983) ("[T]he question of jurisdiction and the merits of an action will be considered intertwined where … 'a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief' "). Here, the FTCA provides both the basis of subject matter jurisdiction and the cause of action. Because the

jurisdiction question is intertwined with the merits of the action, I will treat the 12(b)(1) motion as one for summary judgment.

I pause to note one potential factor militating against conversion of a 12(b)(1) motion to one for summary judgment—the concern that to do so might constitute unfair surprise to the movant. *See* Fed. R.Civ.P. 12(b). No such concern is warranted here, however, because the government has also moved for summary judgment and submits affidavits and exhibits in support of its motions. *See EEOC v. The New Cherokee Corp.*, 829 F.Supp. 73, 77 n. 3 (S.D.N.Y.1993).

Accordingly, the United States' motion to dismiss under Rule 12(b)(1) will be converted to a motion for summary judgment.

## B. Standard of Review for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

## III. DISCUSSION

Because federal courts are courts of limited jurisdiction, I must confront at the outset the jurisdictional challenges raised by the government. In opposition to the government's motion, McLellan has moved to strike various exhibits pertaining to

these jurisdictional challenges raised by the government. In ruling upon a summary judgment motion, I may consider only admissible evidence. *See, e.g. Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990). Because my resolution on the admissibility of these exhibits may affect my analysis of the jurisdiction challenges on summary judgment treatment, I will address the motion to strike first.

### A. Motion to Strike

McLellan moves to strike various exhibits offered by the government, challenging their admissibility under the rules of authentication, hearsay, and personal knowledge.

#### 1. Authentication—The Grossman Letter— Exhibit 8

Exhibit 8[6] purports to be an undated, unsigned draft letter with handwritten notations from the United States addressed to Grossman concerning the terms and conditions of the sale of the former Naval Fuel Annex. McLellan argues that the letter does not bear sufficient indicia of reliability to satisfy the authenticity standards of Fed.R.Evid. 901 & 902. The United States acknowledges, in response, that Exhibit 8 as submitted fails to comply with the requirements of Rules 901 and 902. (United States Mem. in Opp'n to Mot. to Strike at 7.) The United States supplements the evidence by submitting certified copies of the letter to Grossman, in draft and final form, from the National Archives and Records Administration. (*See* Exs. 27 ¶ 10, 28.)

The test of authenticity is straightforward: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a); *see also United States v. Paulino*, 13 F.3d 20, 23 (1st Cir.1994.) And under 902(4), "[e]x-

trinsic evidence of authenticity as a condition precedent to admissibility is not required ... [for] an official record or report or entry therein ... certified as correct by the custodian or other person authorized to make the certification."

I find that the certified copies provided by the United States demonstrate that the documents are a draft and final version of a letter to Grossman concerning the sale of the former Naval Fuel Annex. Accordingly, the authentication requirement of Rule 901(a) is satisfied.

#### 2. Hearsay

McLellan argues that certain exhibits submitted by the United States constitute inadmissible hearsay and, consequently, may not be considered in the context of a motion for summary judgment. Specifically, McLellan moves to strike three exhibits that have been offered by the United States in support of its discretionary function defense to McLellan's claims under the FTCA.

#### a. Exhibit 5—the Murphy Report

Exhibit 5 consists of excerpts from a July 20, 1962, Certificate of Valuation Report of the former Naval Fuel Annex prepared on behalf of GSA by John Murphy. The purpose of the appraisal was to determine the fair market value of the property. (United States 1st Facts, Ex. 5 at BostAR 28.) The challenged excerpt of that report states: "The Navy personnel, charged with the operation of the fuel oil farm, have made the policy never to empty these tanks." Ex. 5 at BostAR 35. McLellan argues that the United States offers this evidence in support of its discretionary function defense to McLellan's claims under the FTCA. (McLellan Mot. to Strike ¶ 2.)

The United States asserts that Ex. 5 is admissible pursuant to the hearsay excep-

6. The exhibits are those offered by the Government in support of its motion and are found in United States 1st Facts.

tions in Fed.R.Evid. 803(8).[7] Rule 803(8)(C) authorizes the admission of "[r]ecords, statements, or data compilations, in any form, of public offices or agencies, setting forth in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness," are not excluded by the hearsay rule. Under the rule, opinions and conclusions of investigators preparing reports are admissible. *See Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *Puerto Rico Ports Authority v. M/V Manhattan Prince,* 897 F.2d 1, 8 (1st Cir.1990); *United States v. Davis,* 826 F.Supp. 617, 621–22 (D.R.I.1993) (remedial investigation report prepared by a private agency on behalf of the Environmental Protection Agency is a "public report"). In *Puerto Rico Ports Authority,* the First Circuit indicated its willingness to interpret *Rainey* broadly. 897 F.2d at 8 (refusing to find inadmissible under *Rainey* conclusory statement attributing a nautical accident to the use of improper speed by the pilot, the failure of the master to take command and control, and the action of the tug in dropping its lines).

The bulk of the Murphy report documents the factual findings that form the basis for his opinion of the property's fair market value. These findings include the topography of the acreage (BostAR 28–29), a catalog of structures on the property (BostAR 33, 37), the condition of the oil tanks (BostAR 35), the operation of the property (BostAr 35–36), the electrical system (BostAR 36), and communication system (BostAR 36). The report does not purport to make findings on naval policy

regarding fuel tank closures or maintenance.

■ I find the statement that the Navy, as a matter of policy, never completely emptied the tanks goes beyond the purview of the hearsay rule exception in 803(8)(C) for public records and reports. Therefore, I will strike as hearsay the portion of Murphy's report which refers to naval policy. The remainder of the report falls squarely within the hearsay exception carved out by 803(8)(C) and, therefore, is admissible as evidence.

### b. *Rainey Declaration,* ¶ 2

McLellan moves to strike paragraph 2 of Captain Benajah L. Rainey's Declaration. The government agrees that paragraph 2 is hearsay and withdraws this portion of Rainey's testimony. (United States Mem. in Opp'n to Mot. to Strike at 14.) The government's voluntary withdrawal of the challenged portion makes unnecessary a determination by me of the admissibility of paragraph 2. I treat the motion to strike paragraph 2 as moot.

### c. *Exhibit 22—Testimony of Riccio*

McLellan asserts that a portion of deposition testimony given by Anthony Riccio, Chief, Hazardous and Toxic Wastes Programs, U.S. Army Corps of Engineers ("Riccio"), constitutes inadmissible hearsay because Riccio is not a competent witness. (McLellan Mot. to Strike ¶ 2.) The challenged portion of Riccio's testimony arises in the context of a series of questions posed to Riccio regarding an Environmental Notification Form sent to the State of Massachusetts by the Government describing the cleanup project to be undertaken by the Government. (Riccio, Ex. 22 at

7. The United States also argues, in anticipation of a challenge to authenticity, that the Murphy Report is admissible under Fed.R.Evid. 803(16) as an ancient document. In support of this argument, the United States submits a certified copy of the report from the National Archives and Records Administra-

tion. (*See* Ex. 29.) Because McLellan has not challenged the authenticity of the report, I find it unnecessary to make a determination about whether or not the report falls within the ancient document exception to the hearsay rule.

75:13–24, 76:1,7–10.) The challenged text, underlined here, states:

Q. —Question 9 asks about increased consumption of water?

A. Uh-huh.

.   .   .   .   .

Q. Did you understand that to refer to water that had accumulated residual oil from the Fuel Annex?

A. *What that was referring to was the water in the tanks. We had knowledge from other studies on three of the tanks, at least, that there was water in the tanks. That's typical process. When a tank enclosure occurred, when they emptied the fuel, they tended to fill it with water.*

(United States 1st Facts, Riccio Dep., Ex. 22 at 78:5–11.)

The United States asserts that the challenged testimony is not hearsay and, therefore, is admissible pursuant to Fed. R.Civ.P. 30(b)(6). Rule 30(b)(6) states in pertinent part that:

[a] party may in the party's notice and in a subpoena name as the deponent a public or private corporation . . . and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth . . . the matters on which the person will testify. . . . The persons so designated shall testify as to matters known or reasonably available to the organization.

Fed.R.Civ.P. 30(b)(6). The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the organization (here, the United States), not of the individual deponents. *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C.1996). "If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation." *Id.; see also Medic Alert Foundation v. Corel Corp.*, 43 F.Supp.2d 933, 942 n. 2 (N.D.Ill.1999) (a party's rule 30(b)(6) expert witness "is competent to testify to matters within the company's knowledge, not only to those within her personal knowledge").

McLellan served the United States a Rule 30(b)(6) notice of deposition requesting that the Government designate person(s) with knowledge about five topics:

A. The construction and operation of the former East Boston Naval Fuel Annex (the "Facility").

B. The activities undertaken to decommission the Facility.

C. The disposition of the Facility to a third party.

D. The evaluation and determination of the Facility's eligibility for inclusion in the Defense Environmental Restoration Program.

E. The investigation and remediation activities conducted on or adjacent to the Facility.

(McLellan Statement of Disputed Material Facts Which Preclude Granting United States Mot. to Dismiss or for Summ. J. ("McLellan 2d Facts"), Ex. 3.) In his deposition testimony, Riccio stated that he was the Government's designee with respect to topics D and E only. (United States 1st Facts, Ex. 22 at 25:4–8.) Specifically, Riccio testified as follows:

Q. Do you have any familiarity with these three subjects [Topics A, B, or C]?

A. [Topic A], I have a general understanding . . .

Q. Do you have any familiarity, including through review of government documents, about the subject B . . ., namely the activities undertaken to decommission the facility?

A. No, not really, other than that I've somewhere read documents that talk about how they removed any fuel from

the—from the tanks prior to decommissioning the facility, but that's just stuff I've read and don't know the validity of that information.

Q. You don't know of your own personal knowledge-

A. No

Q. —whether, in fact, the navy did remove the oil

A. No idea.

Q. —from the tanks or the pipelines?

A. No. The only thing I can say is I know that the tanks that we demolished did not have fuel in them. It was water mainly.

Q. Mainly water?

A. Yeah.

(Riccio, Ex. 22 at 34:16–20, at 35:11–24, at 36:1–9.)

■ As stated above, Rule 30(b)(6) permits designated persons without personal knowledge to testify on behalf of a corporation on matters within the corporation's knowledge. *Taylor*, 166 F.R.D. at 361. Riccio's testimony is plain, however. He was not appearing as a designated expert for the Government on the topic of the decommissioning of the tanks. Consequently, I find that Riccio was not presented to testify knowledgeably about the typical process used when emptying fuel from the tanks. Therefore, I will strike the challenged portion of Riccio's testimony.

*3. Personal Knowledge*

Finally, McLellan moves to strike Capt. Rainey's entire declaration because it is not based on personal knowledge.

---

**8.** McLellan draws my attention to the tardiness of the Government in producing the declaration of Capt. Rainey and argues that it is unfairly hindered in its opposition to the government's motion. (McLellan Mem. in Opp'n to Mot. to Dismiss or for Summ. J. at 17–18.) McLellan requests a continuance for additional discovery should the motion to strike Rainey's declaration not be granted. As will appear, Rainey's Declaration is not material to my ruling on the Government's summary

Evidence is inadmissible under Fed. R.Evid. 602 "only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testified to." *See also Hallquist v. Local 276, Plumbers & Pipefitters Union*, 843 F.2d 18, 24 (1st Cir.1988). The statements made in Rainey's Declaration are based on his personal knowledge as officer in charge of the supply department of the Boston Naval Shipyard in Charleston, Massachusetts from 1963 to 1966. (United States 1st Facts, Ex. 11, Rainey Decl. ¶ 1.) Because they are based on Rainey's personal knowledge while an officer, the statements will not be struck because of lack of personal knowledge.

■ McLellan argues further that the Rainey Declaration should be struck because the statements made by Capt. Rainey concerning the decommissioning of the Naval Fuel Annex contradict official Government records introduced by the United States. Because a piece of evidence allegedly contradicts official records does not make it inadmissible. Therefore, I will not strike the Rainey Declaration on the grounds that it contradicts official records.[8] Having made these determinations on the motion to strike, I now turn to the summary judgment motions.

**B. The United States' Motion for Summary Judgment**

**1. Counts I and III—FTCA**

■ The United States argues that McLellan's FTCA claims are time barred under the statute of limitations. (United States Mem. Supp. Summ. J. at 6–9.)[9] If

---

judgment motion making a continuance unnecessary.

**9.** The filing of a timely administrative claim is a jurisdictional requirement that cannot be waived. *Gonzalez–Bernal v. United States*, 907 F.2d 246, 248 (1st Cir.1990). I note that there is a split in courts on whether the FTCA's statute of limitations is a jurisdictional prerequisite to suit or an affirmative defense. The First Circuit has determined that issue to be jurisdictional. *Coska v. United States*, 114

a plaintiff in an action against the United States under the FTCA has failed to file a timely administrative claim with the appropriate agency, then it must be dismissed. *United States v. Kubrick,* 444 U.S. 111, 123, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Thus, if McLellan has failed to comply with this requirement, he is time barred from bringing an FTCA claim.

### i. Accrual

The FTCA provides:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...

28 U.S.C. § 2401(b). In determining when McLellan's claim accrued, the parties urge the application of competing rules resulting in different outcomes.

■ The government urges the application of the federal rule for determining accrual. The general federal rule is that a tort claim accrues when the plaintiff knows of both his injury and its cause. *Kubrick,* 444 U.S. at 120–22, 100 S.Ct. 352; *see also Attallah v. United States,* 955 F.2d 776, 779 (1st Cir.1992).[10] McLellan counters that First Circuit precedent requires the application of Massachusetts law to determine when an FTCA claim accrues. *See Hau v. United States,* 575 F.2d 1000, 1002 (1st Cir.1978) ("In determining when a claim accrues, for purposes of [the FTCA], this Circuit ... follows the lex loci rule— the applicable law is the law of the state where the claim arose"); *Caron v. United States,* 548 F.2d 366 (1st Cir.1976); *Tessier v. United States,* 269 F.2d 305 (1st Cir. 1959).

McLellan is correct in asserting that pre-*Kubrick* precedent in this Circuit, beginning with *Tessier,* has applied state law in determining when a cause of action accrues in an FTCA case. In *Tessier,* the First Circuit focused on the provision in the FTCA that provides "the United States shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The First Circuit concluded from this language that a 'claim accrues' "when a private person similarly situated would become suable under the law of the state." *Tessier,* 269 F.2d at 309.[11] Later First Circuit cases followed the *Tessier* rule and applied state law in determining when a claim accrues under the FTCA. *See Caron,* 548 F.2d at 367; *Hau,* 575 F.2d at 1002.

F.3d 319, 322 (1st Cir.1997); *Attallah v. United States,* 955 F.2d 776, 779 (1st Cir.1992). As a consequence of this determination, the burden of persuasion lies with the FTCA plaintiff. *See Viqueira v. First Bank,* 140 F.3d 12, 16 (1st Cir.1998).

10. The government asserts that under the federal rule McLellan's alleged injury arose, at the latest, on or about July 31, 1987, when it received a Notice of Responsibility from the DEQE of the release of oil from the site. (United States Mem. Supp. Mot. to Dismiss or Summ. J. at 8.) McLellan's claim, thus, was filed more than ten years after the claim accrued.

11. The consequence of looking to Massachusetts law to determine when McLellan's cause of action against the United States accrued is significant given the flexibility Massachusetts General Laws Chapter 21E affords a plaintiff seeking reimbursement for clean-up costs from a responsible party. Section 11A(2) of

Chapter 21E provides five alternate statute of limitation triggers: a cause of action accrues when the person seeking to recover (1) discovers or reasonably should have discovered that the defendant is liable for the release for which costs were incurred; (2) learns of a material violation of an agreement entered into pursuant to Section 4A of Chapter 21E; (3) incurs all response costs; (4) pays some reimbursable amount; or (5) sends notice to a liable person pursuant to Section 4A, whichever is later. Under this section, McLellan independently and alternatively relies on two triggers: the incurring of all response costs and notice to a liable party. The United States contends neither is applicable. In light of my treatment of the sovereign immunity issue with respect to the FTCA and Chapter 21E, it is not necessary for me to determine the applicability *vel non* of these triggers in any event.

The vitality of the *Tessier* rule as precedent, however, has been thrown into doubt by the Supreme Court's decision in *Kubrick* and decisions in this circuit decided after *Kubrick*. In *Kubrick*, the Supreme Court did not expressly address the question of whether federal or state accrual rules govern an FTCA claim, but rather interpreted the federal rule which the district court had applied. *Kubrick*, 444 U.S. at 118–21, 100 S.Ct. 352. The issue presented in *Kubrick* was whether a claim accrued under the FTCA when the plaintiff knew both "the existence and the cause of his injury," or at a later time when he also knew that "the acts inflicting the injury may constitute medical malpractice." The Court held the federal rule to be that a claim accrues at the earlier time, when the plaintiff knows both the existence and the cause of his injury. *Id.* at 120–21, 100 S.Ct. 352. Implicit throughout the Court's decision is the premise that the federal, not state, rule is the proper rule to apply.

No First Circuit decision post-*Kubrick* has squarely addressed the question whether federal or state law applies in determining when a claim accrues under the FTCA.[12] Several cases, however, have followed, without discussion, the *Kubrick* Court's approach and applied the federal rule. *See Attallah*, 955 F.2d at 779 ("The general rule, within the meaning of the FTCA, is that a tort claim accrues at the time of the plaintiff's injury") (citing to *Kubrick*); *Gonzalez–Bernal v. United States*, 907 F.2d 246, 249 (1st Cir.1990) ("The general rule, within the meaning of the [FTCA], is that a tort claim accrues at the time of the plaintiff's injury") (citing *Kubrick*); *Heinrich v. Sweet*, 44 F.Supp.2d 408, 415 (D.Mass.1999) (applying the federal rule).

McLellan cites two recent Sixth Circuit cases to bolster its argument for the application of state law to determine when its claim accrued. In *Huffman v. United States*, 82 F.3d 703, 705 (6th Cir.1996), the court held that "state law both provides the cause of action and governs the application of the FTCA's two-year statute of limitations." Citing *Huffman* as precedent, the Sixth Circuit in *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir.1997), applied state law principles to determine when the state limitations period began to run in a suit brought under the Price–Anderson Act. The oblique angle at which these cases approach the issue, however, leaves me unpersuaded that state principles of accrual must be applied to McLellan's claim.

*Huffman* involved a suit brought by a private individual against the United States Post Office under the FTCA claiming that the noise emitting from the Post Office constituted a nuisance under Kentucky law. 82 F.3d at 704. The United States filed a summary judgment motion arguing, in part, that the suit had not been brought within the FTCA's two-year statute of limitations. *Id.* The timeliness of the suit turned on whether the alleged nuisance was a permanent or temporary one, the accrual of claims being different depending on the type of nuisance at issue. In reversing the lower court's grant of summary judgment, the Sixth Circuit found a factual dispute remaining upon which the application of the statute of limitations depended. *Id.* at 706. The Sixth Circuit did not discuss the issue of claim accrual explicitly, but instead focused its discussion on the differences between permanent and temporary nuisance actions under Kentucky law. It is noteworthy that in *Huffman* the Kentucky law of accrual was substantially identical to the federal law, dating accrual from when a plaintiff first suffers an injury resulting from a nuisance. *Id.* at 705.

---

**12.** In *Vega–Velez v. United States*, 800 F.2d 288 (1st Cir.1986), a slip-and-fall tort claim against the government, the First Circuit declined "to decide whether federal or state law defines the date of accrual of the cause of action" because the outcome would be the same under either rule. 800 F.2d at 289.

In *Nieman*, the plaintiff brought a claim under the Price–Anderson Act, alleging a discharge of uranium from a nuclear processing facility had damaged and continued to damage his property. 108 F.3d at 1547. As in *Huffman*, a central issue turned on whether the alleged trespass was a continuing one under state law. While deciding that the plaintiff had stated a claim for continuing trespass sufficient to survive the defendant's motion to dismiss, the Sixth Circuit expressed some reservation about the potential conflict with the statutory language that resulted from such a finding. The Price–Anderson Act provided for a statute of limitations requiring the commencement of suit "within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof, but in no event more than ten years after the nuclear accident." *Id.* at 1559. This accrual of claims under that Act is essentially identical to the federal rule adopted in *Kubrick*. The Sixth Circuit noted with concern that a continuing trespass claim would "effectively extend[ ] the time for filing beyond the traditional discovery rule," but declined to decide if such extension was consistent with the Price–Anderson Act. *Id.* at 1561.

The reservation of decision on a potential conflict between state law and the federal law, an issue that strikes so closely to the one before me, undercuts *Nieman*'s advisory value. Moreover, in the absence of any discussion in either *Huffman* or *Nieman* of *Kubrick* or the federal rule of accrual, I am unpersuaded that a departure from the majority position of other circuits in applying the federal rule is supportable based on the Sixth Circuit's holdings. *See, e.g., Johnston v. United States,* 85 F.3d 217, 218–19 (5th Cir.1996); *D.P. Muth v. United States,* 1 F.3d 246, 249 (4th Cir.1993); *Bradley v. United States,* 856 F.2d 575, 578 (3rd Cir.1988), *vacated,* 490 U.S. 1002, 109 S.Ct. 1634, 104 L.Ed.2d 150; *Wehrman v. United States,* 830 F.2d 1480, 1482–83 (8th Cir.1987); *Raddatz v. United States,* 750 F.2d 791–96 (9th Cir.

1984); *Stoleson v. United States,* 629 F.2d 1265, 1268 (7th Cir.1980). In light of that majority position and the post-*Kubrick* decisions in the First Circuit, I am persuaded that the vitality of the *Tessier* rule has been wholly undercut.

█ Ordinarily I would be more than a little diffident as a District Judge about holding, without an explicit ruling from the Court itself, that prior First Circuit precedent is no longer applicable. But the First Circuit's post-*Kubrick* cases have reflected—albeit implicitly—a recognition that the Circuit's prior approach to the accrual question under the FTCA has been abandoned. Moreover the practicalities of this litigation suggest that if I were to hold otherwise, a case I am satisfied is jurisdictionally defective would proceed needlessly pending final judgment. The need to determine jurisdictional issues at the outset, *cf. Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), counsels against prolonging litigation I have concluded, as this Memorandum makes clear, is not within this court's limited jurisdiction. The discretionary certification procedure of 28 U.S.C. § 1292(b) seems artificially cumbersome as an alternative and linguistically inappropriate where, as here, I cannot fairly find "there is substantial ground for difference of opinion." The better procedure, I believe, is to frame the issue clearly for such appellate review of a final decision of this court as may appear appropriate for the parties to seek. Accordingly, I will follow the post-*Kubrick* line of cases and apply the federal rule in determining when a claim accrues under the FTCA.

*ii. Accrual of McLellan's Claim*

█ Although the general federal rule under the FTCA is that a tort claim accrues at the time of the plaintiff's injury. *Kubrick,* 444 U.S. at 120, 100 S.Ct. 352; *Attallah,* 955 F.2d at 779, an exception to the general rule permits fixing accrual at a

later date: when the injury is discovered. The so-called "discovery rule" allows an action to accrue "when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action". *Kubrick*, 444 U.S. at 121–25, 100 S.Ct. 352; *Attallah*, 955 F.2d at 780; *see also Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (applying the discovery rule in a claim brought under the Federal Employers' Liability Act). For damage to real property, an FTCA claim accrues upon plaintiff's discovery of the immediate physical cause of the injury to the property. *See Dyniewicz v. United States*, 742 F.2d 484, 486–7 (9th Cir.1984); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124–25 (3d Cir.1997) (claim accrued upon plaintiff's discovery of the chemical contamination); *Warminster Township Mun. Auth. v. United States*, 903 F.Supp. 847, 850–51 (E.D.Pa.1995) (FTCA's statute of limitations begins running when plaintiff discovered the presence of hazardous substances in its well).

Applying the discovery rule here, McLellan's claim accrued when it knew, or with reasonable diligence should have known, of the oil contamination on the Site. McLellan states that shortly after assuming ownership in 1984 it hired an environmental consultant firm to assess the Site. (McLellan 1st Facts ¶ 5.) The environmental consultant's report, dated December 1984, informed McLellan of the presence of oil contamination on the Site. (Compl. ¶ 13; McLellan 1st Facts, Ex. 1 ¶ 7, Ex. 7.) McLellan soon thereafter began a series of response actions at the Site to remediate contamination. McLellan then filed reports with the DEQE detailing the remediation activity at the site. (McLellan 1st Facts ¶ 8.) In response to these reports, the DEQE sent a Notice of Responsibility letter to McLellan on July 31, 1987, regarding the contamination at the site. (McLellan 1st Facts, Ex. 19.) The letter also listed other responsible parties, including the United States. (*Id.*)

The weight of these facts leads me to conclude as a matter of law that McLellan knew of the injury, at the latest, by July 31, 1987. That McLellan may not have known the full extent of the injury is irrelevant. *See, e.g., Goodhand v. United States*, 40 F.3d 209, 212 (7th Cir.1994) ("The statute of limitations begins to run upon the discovery of the injury, even if the full extent of the injury is not discovered until much later"); *Robbins v. United States*, 624 F.2d 971, 972–73 (10th Cir. 1980) (holding that an injury beings the running of the statutory period even if the 'ultimate damage is unknown or unpredictable').

McLellan filed its claim with the NFEC on August 4, 1997. (United States 1st Facts, Ex. 21.) Its failure to file a timely claim bars this action under the FTCA. In so finding, I stress that the FTCA's statute of limitations represents a balance struck by Congress in which limited waiver of sovereign immunity is conditioned upon a prompt presentation of tort claims against the government. *Gould v. United States, Dep't of Health & Human Servs.*, 905 F.2d 738, 742 (4th Cir.1990) (en banc); *accord Kubrick*, 444 U.S. at 117–18, 100 S.Ct. 352; *Hart v. Dep't of Labor ex rel. United States*, 116 F.3d 1338, 1341 (10th Cir.1997) (citing *Pipkin v. United States Postal Serv.*, 951 F.2d 272, 275 (10th Cir. 1991)).

Accordingly, I will grant the United States' motion for summary judgment on Counts I and III on statute of limitations grounds.

### 2. Count II—Mass. Gen. L. Ch.21E

The United States argues Count II brought under Chapter 21E should be dismissed because of a defect in pleading or, alternatively, because sovereign immunity has not been waived.

#### a. Defective Complaint

A plaintiff bringing suit against the United States is "required to set forth in

the complaint the specific statute containing a waiver of the government's immunity from suit." *Warminster Township Municipal Auth. v. United States*, 903 F.Supp. 847, 849 (E.D.Pa.1995); *Reeves v. United States*, 809 F.Supp. 92, 94 (N.D.Ga. 1992), *aff'd*, 996 F.2d 1232 (11th Cir.1993); *see also Swift v. United States Border Patrol*, 578 F.Supp. 35, 37 (S.D.Tex.1983) ("[I]t is incumbent upon the Plaintiff to state in his complaint the grounds upon which the sovereign consented to [the] suit."); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1212 at 126 (1990).

■ Count II of McLellan's complaint fails to identify an applicable waiver of sovereign immunity. The Complaint, instead, relies on the doctrine of supplemental jurisdiction to give jurisdiction over the state law claim. (Compl.¶ 3.) The doctrine of supplemental jurisdiction, however, is not a waiver of sovereign immunity nor does it expand the power of courts in terms of the parties over whom it may exercise jurisdiction. *Cf. Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989) (holding that 28 U.S.C. § 1361 creating the federal mandamus action does not constitute a waiver of sovereign immunity by the United States).

In its legal argument regarding summary judgment, McClellan identifies the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6961, *et seq.*, as the source of waiver. McLellan argues that its failure to identify the RCRA as the statute providing the necessary waiver of sovereign immunity is not fatal because jurisdiction lies under the FTCA. "Failure to allege specifically the statute conferring jurisdiction is not always fatal to an action if facts showing jurisdiction appear in the complaint." *Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir.1980). As already discussed, however, I have found no jurisdiction un-

der the FTCA. (*See supra* at 10–13.) The complaint provides no other facts showing jurisdiction.

In its opposition to the government's motion, McLellan contends that the required waiver of sovereign immunity is nevertheless explicitly set forth in RCRA, 42 U.S.C. §§ 6961 *et. seq.* (McLellan Mem. in Opp'n to Mot. to Dismiss or for Summ. J. at 18–23.) In *Warminster*, the court expressly stated that it could not consider an argument raised in opposition to the government's motion to dismiss that the requisite waiver was found in a statute when the complaint failed to allege that the statute conferred subject matter jurisdiction. *Warminster*, 903 F.Supp. at 849.[13] In *Swift*, however, the court was confronted with a plaintiff that had failed to allege in its complaint the grounds upon which the sovereign had consented to suit. The court was willing to allow amendment of the complaint if the plaintiff had perfected a claim under the proper statute granting consent to suit. *Swift*, 578 F.Supp. at 37. Accordingly, I will examine whether McLellan has a claim under the RCRA that would warrant granting leave to amend its complaint.

*b. RCRA*

Section 6961(a) of the RCRA states:

Each department, agency, and instrumentality ... of the Federal Government ... engaged in any activity resulting, or which may result, in the disposal or management of solid waste of hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural ..., respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements.... The Federal, State,

---

**13.** The *Warminster* court was ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). As discussed in Section II.A., *supra*, I have converted the govern-

ment's Rule 12(b)(1) motion into a motion for summary judgment under Rule 56(c). In so doing, I am free to look beyond the pleadings in rendering my decision.

interstate, and local substantive and procedural requirements referred to in this subsection include, but are not limited to, all administrative orders and all civil administrative penalties and fines, regardless of whether such penalties or fines are punitive or coercive in nature or are imposed for isolated, intermittent or continuing violations. The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement.

Clearly, in certain instances the § 6961(a) waives the United States' sovereign immunity.

McLellan argues that the plain language of this section expressly waives sovereign immunity "to any substantive or procedural requirement" of state solid or hazardous waste laws, such as Chapter 21E. (McLellan Mem. in Opp'n to Mot. to Dismiss or for Summ. J. at 18–19.) McLellan cites two cases in which courts interpreted Section 6961(a) to permit suit against the United States based on state law to recover cleanup costs. *See Charter Int'l Oil v. United States,* 925 F.Supp. 104, 106–08 (D.R.I.1996) (holding that Section 6961(a) of the RCRA constitutes an express waiver of sovereign immunity against suits seeking recovery for damages from the federal government for any present or past actions that violate state hazardous or solid waste laws); *Crowley Marine Services, Inc. v. Fednav Ltd.,* 915 F.Supp. 218, 222–23 (E.D.Wash.1995) (holding RCRA waives sovereign immunity for private cost recovery actions for damages brought under state hazardous law). Additionally, McLellan relies on the legislative history of § 6961(a) to confirm the waiver of sovereign immunity. I conclude, however, that a clear focus on the precise statutory language—"requirements ... respecting control and abatement" including "all administrative orders and all civil administrative penalties and fines"—does not plainly encompass response costs and thus does not evidence an unambiguous waiver of sovereign immunity to private suits for reimbursement of response costs.

■■■■ Waivers of federal sovereign immunity must be unequivocally expressed in the statutory text. *Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.... To sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Id.* at 2096–97 (internal citations and quotations omitted). Where a waiver does not appear clearly in any statutory text, the legislative history cannot supply such a waiver. *Id.* Consequently, I decline the invitation made by both parties to consider snippets of legislative history they contend support their respective positions.

In *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996), the Supreme Court considered whether the citizen suit provision of RCRA, § 6972, authorized a private cause of action to recover the prior cost of cleaning up toxic waste that did not, at the time of suit, constitute a continuing endangerment to health or the environment. 516 U.S. at 481, 116 S.Ct. 1251. In articulating RCRA's purpose, the Court stated that "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards...RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, disposal of that waste which is nonetheless generated so as to minimize the present and future threat to human health and the environment." *Id.* at 483, 116 S.Ct. 1251 (internal quotations omitted). The Court concluded that "a private party cannot recover the cost of a past cleanup effort under RCRA...." *Id.* at 488, 116 S.Ct. 1251.

The discussion of the purpose of RCRA by the *Meghrig* Court with its attention to regulatory enforcement rather than historical damage assessment when coupled with the absence in the language of § 6961(a) of an express waiver of sovereign immunity from suit by a private citizen for money, leads me to conclude that sovereign immunity has not been waived by RCRA for response cost suits. The plain language of § 6961(a) does not embrace the type of suit brought by McLellan. At most, there is an ambiguity regarding a waiver, and such an ambiguity must be construed in favor of immunity. *Lane*, 116 S.Ct. at 2096 (citing *United States v. Williams*, 514 U.S. 527, 115 S.Ct. 1611, 1616, 131 L.Ed.2d 608 (1995)). Further, reliance on legislative history to supply a waiver of sovereign immunity is improper under *Lane*. In the absence of a waiver, this court lacks subject matter jurisdiction over Count II. Accordingly, I will grant the United States' motion for summary judgment with respect to Count II.

### CONCLUSION

For the reasons set forth above:

1. McLellan's motion to strike is GRANTED in part and DENIED in part;

2. The motion of the United States for summary judgment as to Counts I, II and III is GRANTED;

3. McLellan's motion for partial summary judgment as to Count I is DENIED as moot in light of my disposition of the summary judgment motion of the United States;

4. McLellan's motion for summary judgment as to Count II is DENIED in light of my disposition of the summary judgment motion of the United States.